# United States Court of Appeals
## For the First Circuit

No. 00-2238
No. 00-2239

UNITED STATES OF AMERICA,

Appellant and Cross-Appellee,

v.

JAMES M. KNOTT, SR.; RIVERDALE MILLS CORP.,

Defendants, Appellees and Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, <u>U.S. District Judge</u>]

Before

Torruella, <u>Circuit Judge</u>,
Cyr, <u>Senior Circuit Judge</u>,
and Lynch, <u>Circuit Judge</u>.

<u>John L. Smeltzer</u>, Trial Attorney, Environment & Natural Resources
Division, United States Department of Justice, with whom <u>John C.
Cruden</u>, Acting Assistant Attorney General, <u>Patty Merkamp Stemler</u>, Trial
Attorney, Criminal Division, and <u>David M. Uhlmann</u> and <u>Jared Goldstein</u>,
Trial Attorneys, Environment & Natural Resources Division, were on
brief, for appellant and cross-appellee.

<u>Warren G. Miller</u>, with whom <u>Henry T. Dunker</u> and <u>Jamy B. Buchanan</u>
were on brief, for appellees and cross-appellants.

**LYNCH, Circuit Judge**. This is a case of first impression for this court as to the standards for awarding attorneys' fees against the United States for its initiation of criminal proceedings, as provided for under the Hyde Amendment, Pub.L. No. 105-119, 111 Stat. 2440, 2519 (1997), reprinted in 18 U.S.C. § 3006A (statutory note). The district court awarded $68,726.00 in fees to Riverdale Mills, which had been one defendant in a criminal prosecution for violation of the Clean Water Act, and denied fees to James Knott, the other defendant. The government voluntarily dismissed the action after the district court suppressed some of the prosecution's evidence. The district court awarded fees on the grounds that the government's prosecution was "vexatious." We reverse the award of fees to Riverdale Mills and affirm the denial of fees to Knott.

## I.

Riverdale Mills Corporation and its principal owner, James Knott, operate a plant in Northbridge, Massachusetts, that manufactures plastic-coated steel wire mesh. The production

involves two processes, one producing rather acidic wastewater, and the other producing quite caustic (i.e., alkaline) wastewater. Riverdale Mills ultimately discharges this industrial waste into the public sewer owned by the Town of Northbridge.

The Clean Water Act prohibits the indirect discharge of pollutants into the waters of the United States through publicly owned treatment works. 33 U.S.C. § 1317(b)(1). The implementing regulations for the Act prohibit the discharge of wastewater with a pH below 5.0 standard units ("s.u.")[1] into publicly owned sewer systems. 40 C.F.R. § 403.5(b)(2). Any person who "knowingly" violates these standards is subject to felony prosecution. 33 U.S.C. § 1319(c)(2)(A).

Riverdale Mills's state permit for discharging its waste into the public sewer states that Riverdale Mills will ensure that the wastewater falls within acceptable limits by

_____

[1] The term pH stands for a measure of acidity and alkalinity on a logarithmic scale from 0 to 14, with 7.0 representing neutrality, numbers below 7 representing increasing degrees of acidity, and numbers above 7 representing increasing alkalinity. Each whole number step away from 7 represents a ten-fold increase in acidity or alkalinity, such that a sample with a pH of 4.0 s.u. is ten times more acidic than a sample with a pH of 5.0 s.u., and so forth.

combining the two streams inside the plant so that the caustic water neutralizes the acidic water, and then further neutralizing the waste by adding a caustic soda. Following this pretreatment, on the design in the permit, the now-combined wastewaters would flow intermittently through an effluent pipe to a manhole outside the building on Riverdale Street (Manhole #1), where it joins a sewer pipe. The discharge then would flow through that sewer pipe approximately 100 yards to a second manhole (Manhole #2), where the pipe joins the public sewer line.

Acting on an anonymous tip that this pretreatment system was not in operation, two EPA civil inspectors went to Riverdale Mills for an unannounced inspection on October 21, 1997. The district court determined that Knott consented to the inspection, but determined on disputed facts that his consent was qualified by the express condition that the EPA inspectors be accompanied by Riverdale Mills representatives during the entire course of their inspection. Knott then accompanied the inspectors to Manhole #1, where they took two initial samples (neither below pH 5.0 s.u.) and observed only an intermittent discharge. Because of the intermittent nature of the discharge

-4-

flow, the inspectors then allegedly informed Knott that they would have to conduct periodic sampling throughout the day. The group then embarked on a tour of the facility, during which the EPA inspectors discovered that, contrary to Knott's alleged statement that morning, the wastewater treatment facility at Riverdale Mills was not in operation. Apparently, the two wastewater streams were not being mixed in the treatment facility as intended because a valve was turned to the wrong position, and also the tank where caustic soda was to be added to the wastewater was being bypassed.

In the early afternoon, the inspectors returned to Manhole #1, on the street in front of the plant and in the plain view of Riverdale Mills employees. There they took a series of samples, and those additional samples yielded pH readings ranging from 2.19 to 7.48 s.u., with thirteen of the fourteen samples showing extremely low pH readings (between 2.19 and 2.59 s.u.).[2] The district court determined that the EPA inspectors were not accompanied by a Riverdale Mills representative for

---

[2]    Riverdale Mills disputes the log of these samples, arguing that the readings were actually in the "7" range, but that the number "7" originally written in the log was subsequently altered to appear to be a "2."

this sampling.  The inspectors then returned to the plant and a Riverdale Mills employee completed their tour of the facilities. The EPA inspectors also gave a split sample from one of their afternoon samples to the employee, who signed the chain of custody form for it.  At the EPA's closing conference with Knott, they discussed the low pH discharges, and Knott informed the EPA inspectors that he owned Riverdale Street and he claimed ownership of the sewer line under the street.

After leaving the plant, the EPA inspectors went to Manhole #2.  This is where the "private" sewer line joined the municipal line, according to Knott's statement at the meeting. There the inspectors noted a second residential sewer line also joined at the manhole, seven feet below the Riverdale Mills line.  Accordingly, they took three different samples at this site.  One was from the discharge of the residential line, which the EPA says yielded a pH of approximately 7 s.u.  One was from water standing in a trough at the manhole, which the EPA says yielded a pH around 7 s.u.  The last one was from the discharge flowing from the Riverdale Mills line, which the EPA says yielded a pH of around 4 s.u.  In their field log, the number "4" for this final measurement appears to be written over a "7."

(The district court later concluded that the recorded entry for that sample had been altered from its actual reading of 7 s.u.)

Based on this information, the EPA criminal division obtained a federal search warrant and conducted a second inspection on November 7, 1997. A large number of samples were taken at Manhole #1. Most had a pH below 5.0 s.u. and the samples worsened -- that is, became even more acidic -- as the day progressed. EPA agents also took seven samples in the morning at Manhole #2, and all had pH readings around 5.0 or 6.0 s.u. Again, the agents observed that the required pretreatment system at the Riverdale Mills plant was largely not operational; although on that day the two wastewater streams were mixing in the plant, the process adding caustic soda was still being bypassed. Plant employees told the EPA that the pretreatment system had not been in operation since sometime in the spring of 1997, and that Knott was aware that wastewater was being discharged without pretreatment.

In July 1998, the EPA executed a second search warrant to measure the effects of groundwater infiltration between Manhole #1 and Manhole #2. This was done in response to Knott's claim that he owned the intervening sewer line and that by the

time the wastewater reached the public sewer at Manhole #2, groundwater infiltration inevitably brought it within the legal limit. The EPA's expert concluded that even making assumptions favorable to Knott, any wastewater with a pH below 3.0 s.u. at the first manhole would reach the sewer line at the second manhole with a pH below 5.0 s.u.

On August 12, 1998, a federal grand jury indicted Knott and Riverdale Mills on two counts of violating the Clean Water Act by knowingly discharging industrial wastewater with a pH below 5.0 s.u. into a publicly owned treatment works on October 21 and November 7, 1997. Following the indictment, both the U.S. Attorney's office and the regional EPA issued standard press releases announcing the indictment and its allegations.

On October 14, 1998, Knott and Riverdale Mills moved to suppress evidence from the afternoon sampling on October 21, 1997 as the result of an unlawful search, and also to suppress the sampling obtained through the November 7 search warrant, as the fruit of the October 21 sampling. On February 16, 1999, the district court suppressed the sampling results from the afternoon of October 21, 1997, finding that the EPA inspectors exceeded the scope of Knott's consent when they sampled the wastewater stream without a Riverdale Mills representative present. However, the district court declined to

suppress the evidence obtained on November 7, reasoning that even though the basis of the warrant was in part the October 21 afternoon sampling, the agents acted in good faith executing the warrant.

The government sought leave of court to dismiss the indictment without prejudice on April 23, 1999, because in the course of preparing for trial, it determined that the suppression had substantially weakened its case and raised a question as to whether it could make a sufficiently compelling case to the jury to meet its burden of proof on the remaining evidence. Leave of the court to dismiss the indictment without prejudice was granted by the district court on May 6, 1999.

Following the dismissal of the indictment, Knott and Riverdale Mills filed a motion to recover reasonable attorneys' fees under the Hyde Amendment. The district court awarded attorneys' fees to Riverdale Mills as a prevailing party[3] because, in the view of the court, while the prosecution was neither frivolous nor in bad faith, it was "clearly vexatious" within the meaning of the Hyde Amendment. United States v. Knott, 106 F. Supp. 2d 174, 180 (D. Mass. 2000). The district court, relying in part on the Eleventh Circuit's decision in United States v. Gilbert, 198 F.3d 1293 (11th Cir. 1999), held that a

---

[3]     In the district court, the government contested whether the defendants were properly considered "prevailing parties" within the meaning of the Hyde Amendment, as the indictment was dismissed without prejudice.

defendant seeking fees under the Hyde Amendment must show that the government's legal position was asserted "in bad faith or without any foundation or basis for belief that it might prevail" and thus amounted to "prosecutorial misconduct."[4] See 106 F.Supp.2d at 179 (quoting Gilbert, 198 F.3d at 1303-04). The district court rested its conclusion that the prosecution here was "vexatious" on the court's belief that the government did not have "any credible evidence" to support the accusation that the defendants discharged waste with a pH below 5.0 s.u. into the public sewer. Id. To the contrary, the court concluded, the samples taken at the second manhole, "the point of discharge into the public sewer," showed that Riverdale Mills "was not in violation of the Clean Water Act." Id. The district court did not, however, find that the agents or prosecutors in this case acted maliciously, or with any particular personal motive to vex the defendants. The court rested instead simply on the purported absence of credible evidence, though it also discussed some alleged misconduct in the collection of samples and the conduct of searches. Accordingly, the court awarded fees in the sum of $68,726.00 to the company against the United States under the Hyde Amendment. Id. at 181. The court

---

[4]    The district court also cited to two different definitions of "vexatious" from Black's Law Dictionary: one defining vexatious as "without reasonable or probable cause," the other defining a "vexatious" charge as one that is calculated to "harass, disquiet, or annoy." 106 F. Supp. 2d at 179 (citing  Black's Law Dictionary 1565 (6th ed. 1990)).

denied fees to Knott because his net worth exceeded $2 million, reasoning that the limitations of 28 U.S.C. § 2412(d) apply to the Hyde Amendment.  Id. at 178.

The government appeals this fee award, arguing (1) that the court applied the wrong legal standard in defining vexatiousness, as it did not find any malice or intent to harass in the prosecution, but rather found only that the prosecution lacked foundation; (2) that the district court's conclusion that the prosecution lacked foundation was in clear error, as the government had ample evidence to prove the violations prior to the suppression ruling, and indeed it could have pursued the charges even on the evidence that remained after the court's suppression order; and (3) that the court erred in identifying certain isolated acts of government agents as evidence of vexatiousness.

Knott, in turn, challenges the district court's ruling against him, arguing that he could seek an award under the Hyde Amendment pursuant to the procedures and limitations of 28 U.S.C. § 2412(b) instead of § 2412(d), thereby eliminating the net worth limitation and entitling him to recovery.

**II.**

We initially determine the legal issue raised in Knott's cross-appeal from the district court's dismissal of his claim for fees under the Hyde Amendment on the ground that his

-11-

net worth renders him ineligible for an award of fees. At issue is whether the Hyde Amendment's incorporation of the "procedures and limitations" of the Equal Access to Justice Act, 28 U.S.C. § 2412, encompasses all of the avenues to relief contained in § 2412, or simply refers to the procedures and limitations imposed in § 2412(d).

The Hyde Amendment provides that fee awards "shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under section 2412 of [the Equal Access to Justice Act] . . . ." 111 Stat. at 2519. Section 2412 of the EAJA, however, provides for the award of attorneys' fees in two separate subsections, each containing different procedures and limitations.

EAJA Subsection 2412(b) provides for the recovery of attorneys' fees against the United States, not by supplying an independent basis for recovering fees, but instead by subjecting the United States to other existing provisions which allow recovery of fees against private parties in the civil context. It provides that "a court may award reasonable fees and expenses of attorneys, in addition to [costs], to the prevailing party in any civil action brought by or against the United States . . .

-12-

. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b). Awards under § 2412(b) are limited, of course, by the standards of the common law or the terms of the incorporated statutory provision upon which the award is based, just as an award against a private party would be, but § 2412(b) itself does not otherwise provide procedures for or limitations upon fee awards under the EAJA.

EAJA Subsection 2412(d) supplies an additional substantive basis for a civil party to recover fees against the United States. It provides that "a court shall award [fees and expenses] to a prevailing party . . . unless the court finds that the position of the United States was substantially justified." 28 U.S.C. § 2412(d)(1)(A). Unlike § 2412(b), § 2412(d) itself subjects fee awards to certain procedures and limitations. An individual may not recover fees under subsection (d) if his individual net worth exceeds $2 million (nor can a corporation, if its net worth exceeds $7 million and it has more than 500 employees). See 28 U.S.C. § 2412(d)(2)(B).

In addition, subsection (d) caps the hourly rate at which an award may be granted at $125. 28 U.S.C. § 2412(d)(2)(A). Knott concedes that he would be ineligible under the $2 million net worth limitation, but contests its applicability.

The district court rejected Knott's argument that he is not subject to the net worth limitation or the cap on hourly rates because defendants may elect to proceed under either 28 U.S.C. § 2412(b) or (d). The district court concluded that the procedures and limitations of EAJA § 2412(d) applied to applications for fees under the Hyde Amendment for two main reasons. First, the district court reasoned that allowing defendants to elect to proceed under § 2412(b) would effectively read the clause "under the procedures and limitations of section 2412" out of the Hyde Amendment. Second, the district court, confronted with two interpretations of the statute, construed it narrowly in accord with the principle that waivers of sovereign immunity are to be construed narrowly. See 106 F. Supp. 2d at 177-78.

The district court was correct to require fee applicants to meet the eligibility requirements of EAJA § 2412(d). The Hyde Amendment expressly adopts "procedures and

-14-

limitations" from the EAJA. We hold that this reference incorporates the "procedures and limitations" contained in EAJA § 2412(d). Accord United States v Ranger Elec. Communications, Inc., 210 F.3d 627, 632-33 (6th Cir. 2000).

Knott's suggested reading of the Hyde Amendment undercuts the language of the provision and policy concerns underlying the incorporation of these procedures and limitations. If defendants could elect to proceed under § 2412(b), as Knott argues, it is not clear that the Hyde Amendment's incorporation of "procedures and limitations" from the EAJA would have any practical effect. In order to give meaningful effect to the plain language of the Hyde Amendment, then, the incorporation is best read to refer to the limitations contained in EAJA § 2412(d).

This is particularly so given that, unlike EAJA § 2412(d), EAJA § 2412(b) does not supply an independent substantive ground upon which to recover fees, instead directing applicants to other bases providing a remedy of attorneys' fees, including their procedures and limitations, and simply subjecting the United States to the same obligations regarding attorneys' fees as private parties. Because EAJA § 2412(b) does

-15-

not provide a complete and independent ground for a fee award but instead affords relief only by reference to otherwise existing avenues to recover fees, it would create a peculiar circularity to allow a defendant relying on the Hyde Amendment as the substantive basis of a request for attorneys' fees to elect to proceed through EAJA § 2412(b) in order to avoid the limitations imposed in EAJA § 2412(d), given that the Hyde Amendment itself incorporates the procedures and limitations of the EAJA. See Ranger Elec. Communications, 210 F.3d at 633.

Finally, the fact that the Hyde Amendment waives sovereign immunity and the policy concerns regarding the impact of awarding fees in the criminal context, as reflected in the legislative history of the Amendment, both counsel in favor of narrowly construing the Amendment, and therefore incorporating the procedures and limitations of EAJA § 2412(d). In order to make best sense of the language of the statute, then, we conclude that the procedures and limitations referenced are those laid out in § 2412(d).

## III.

We next address the government's appeal from the award of attorneys' fees in favor of Riverdale Mills.

A.   The Hyde Amendment Legal Standard

Congress enacted the Hyde Amendment in 1997 in response to perceived instances of prosecutorial abuse by the United States. See United States v. Gilbert, 198 F.3d 1293, 1299-1303 (11th Cir. 1999) (reviewing legislative history). The purpose of the Amendment was to allow defendants to recover attorney's fees and costs in cases of prosecutorial misconduct. Id. The provision provides that a district court may award attorneys' fees and other costs to a prevailing defendant "where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under [the Equal Access to Justice Act] . . . ."   111 Stat. at 2519.

The Hyde Amendment was patterned after the Equal Access to Justice Act, 28 U.S.C. § 2412, which provides for an award of attorney's fees against the United States in civil cases. The Hyde Amendment differs in at least two important respects. First, it raises the standard for awarding fees. The Hyde Amendment allows recovery by prevailing criminal defendants only where the position of the United States was "vexatious, frivolous, or in bad faith," in contrast to the EAJA, which authorizes an award to a prevailing civil party in any case where the position of the United States was not "substantially

-17-

justified," see 28 U.S.C. § 2412(d)(1)(A). Indeed, the legislative history of the Hyde Amendment shows that in drafting the provision, Congress considered and rejected as too easily met both the "not substantially justified" standard of the EAJA and a standard (modeled after the Firearms Owners' Protection Act of 1986, see 18 U.S.C. § 924(d)(2)(B)) which would have awarded fees, inter alia, where the United States' position was "without foundation." See Gilbert, 198 F.3d at 1301-02. Second, unlike the EAJA, the Hyde Amendment places the burden of proof on the defendant to demonstrate that the government's position was "vexatious," "frivolous," or "in bad faith." See id.

In construing and applying statutory terms, we begin by examining the language of the statute itself. See, e.g., Bailey v. United States, 516 U.S. 137, 144 (1995). The words "vexatious, frivolous, or in bad faith" are not defined in the statute. In such circumstances, courts typically read statutory terms to convey their ordinary meaning, see, e.g., Gilbert, 198 F.3d at 1298 (citing Chapman v. United States, 500 U.S. 453, 462 (1991)), including as reflected in dictionary definitions, see, e.g., Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Servs., --- U.S. ---, 121 S. Ct. 1835, 1839 (2001) (relying on definition of "prevailing party" in Black's Law Dictionary); id. at 1846 (Scalia, J., concurring). Black's Law Dictionary defines the term "vexatious" -- the term at issue in

-18-

this case -- to mean "without reasonable or probable cause or excuse; harassing; annoying." Black's Law Dictionary 1559 (7th ed. 1999). It further defines "vexatious suit" to mean a "lawsuit instituted maliciously and without good cause." Id. Standard English-language dictionaries give the term similar meaning. See, e.g., Webster's Third New Int'l Dictionary 2548 (3d ed. 1961) (defining "vexatious" to mean, inter alia, "lacking justification and intended to harass"); 19 Oxford English Dictionary 596 (2d ed. 1989) (defining "vexatious" for legal purposes as "[i]nstituted without sufficient grounds for the purpose of causing trouble or annoyance to the defendant").

Circuit courts construing the Hyde Amendment have varied in interpreting the term "vexatious." The Gilbert court, for instance, relies on a definition of "vexatious" as "without reasonable or probable cause or excuse." See 198 F.3d at 1298-99; accord In re 1997 Grand Jury, 215 F.3d 430, 436 (4th Cir. 2000). By contrast, the Ninth Circuit, in United States v. Sherburne, 249 F.3d 1121 (9th Cir. 2001), held that a finding of vexatiousness under the Hyde Amendment requires both a determination that the prosecution was "objectively deficient" in that it "lack[ed] merit" and a finding that the prosecution possessed "an element of maliciousness, or an intent to harass." Id. at 1126. The Sherburne court referred to the finding that the suit lacked merit as an "objective" component of vexatiousness and the finding that the suit was prosecuted with some subjective malice or

-19-

intent to harass or annoy as a "subjective" component.  <u>Id.</u> at 1127.
Other courts have utilized a standard more amenable to the party
seeking fees.  <u>See</u> <u>United States</u> v. <u>Holland</u>, 34 F. Supp. 2d 346 (E.D.
Va. 1999) (framing the inquiry as "whether a reasonable prosecutor
should have concluded that the applicable law and the available
evidence were insufficient to prove the defendants' guilt beyond a
reasonable doubt, and, if so, was the continuation of the prosecution
vexatious").

We hold that a determination that a prosecution was
"vexatious" for the purposes of the Hyde Amendment requires both a
showing that the criminal case was objectively deficient, in that it
lacked either legal merit or factual foundation, and a showing that the
government's conduct, when viewed objectively, manifests maliciousness
or an intent to harass or annoy.  Such a reading best comports with the
language employed by Congress in the Amendment.  This is especially so
when considered in the context of Congress's concern to protect against
prosecutorial misconduct while at the same time providing a
sufficiently stringent standard to avoid undermining appropriate
prosecutorial zeal.

The standard implied by the district court and advanced
by the defendants -- that "vexatious" conduct can be shown
simply by showing that the charges brought by the United States
were ultimately determined to be without either evidentiary or

-20-

legal foundation -- does not adequately account for Congress's efforts to limit Hyde Amendment awards to cases of affirmative prosecutorial misconduct rather than simply any prosecution which failed.  As the Gilbert court notes, "[i]n prosecuting crime, government attorneys are entitled to be zealous advocates of the law on behalf of their client, the people of the United States.  While a prosecutor is not at liberty to strike foul blows, he may strike hard ones, and '[h]e may prosecute with earnestness and vigor -- indeed, he should do so.'"  198 F.3d at 1303 (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

The structure of the statute also militates against resting vexatiousness simply upon a finding that the prosecution lacked "any credible evidence."  It may be that if the government pursued a position so obviously wrong that no reasonable prosecutor could have supported it, the defendant would be entitled to a fee award under the Hyde Amendment. Without a finding of bad faith or improper motive, however, if the government pursues a prosecution without any foundation or basis for belief that it might prevail, such a prosecution would more appropriately be deemed "frivolous" than "vexatious." Reading "vexatious" to encompass such a case would render it

-21-

synonymous with "frivolous," thus improperly rendering the term mere surplusage.

Finally, awarding fees upon a determination that the prosecution lacked sufficient evidence does not accord with the legislative history of the Hyde Amendment. In rejecting the "not substantially justified" formulation of the EAJA and the "without foundation" formulation of the Firearms Act, Congress sought narrow language "meant to sanction and deter prosecutorial misconduct, not prosecutorial zealousness per se." Gilbert, 198 F.3d at 1304.[5] The Hyde Amendment's shifting of the burden of proof also reflects this concern. The alternative construction urged by the defendants would burden the United States with the threat of a large number of fee applications arising from circumstances quite different than those against which Congress sought to protect.

_____

[5] Indeed, though the Gilbert court provides a definition for "vexatious" that does not explicitly require improper motive, it assesses the government's conduct in light of all three elements that would support a Hyde Amendment award simultaneously, so it is not entirely clear how the court would apply "vexatious" in isolation. The court does note that the Hyde Amendment was "targeted at prosecutorial misconduct, not prosecutorial mistake." 198 F.3d at 1304.

To make best sense of the statutory language and in light of the purposes embodied in the Hyde Amendment, we conclude that something more than simply an inadequate evidentiary foundation is required to demonstrate that the prosecution was "vexatious" within the meaning of the Hyde Amendment -- that is, some finding of malice or improper motivation is required.[6] After all, there is an alternate ground

_____

[6] In requiring this element of malice or improper motive, we recognize that our construction of "vexatious" here differs from the way the term is construed in the Title VII context. See Tang v. Rhode Island Dep't of Elderly Affairs, 163 F.3d 7, 13 (1st Cir. 1998) ("A district court may in its discretion award attorney's fees to a prevailing defendant . . . upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.") (quoting Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978)). Like the Sherburne court, we conclude that the context differs in material ways, most importantly in that, because the Hyde Amendment addresses fees in the criminal context, Congress enacted it against a background in which courts have no inherent power to award fees. See Sherburne, 249 F.3d at 1127 n.5.

Defendants also point to common law awards of attorneys' fees, where "vexatious" litigation need not always require subjective bad faith in order to justify a fee award. See Local 285 v. Nonotuck Res. Assocs., 64 F.3d 735, 737-38 (1st Cir. 1995) (holding that subjective bad faith is not a prerequisite to a fee award under the common law); but cf. Rivera Morales v. Benitez de Rexach, 541 F.2d 882 (1st Cir. 1976) (overturning common law fee award where there was no finding that defendants acted in bad faith). This reliance on occasional cases from a civil context which did not require subjective bad faith ignores the peculiar concern, unique to the criminal context, that the drafters of the Hyde Amendment had to avoid chilling legitimate prosecutions. In addition, common law fee awards involve a full-blown equitable analysis and depend on the discretion of the court, a requirement overlooked in the attempt to draw a parallel to

-23-

in the statute to award fees where an action is frivolous.  In requiring that the government's conduct manifest malice or an intent to harass or annoy in order to be "vexatious," however, we do not intend an inquiry into subjective intent, and we reject the approach of Sherburne to the extent it suggests that such attention to subjective motivations is required.  Rather, the issue is whether the government's conduct, when viewed objectively, manifests, or is tantamount to, malice or an intent to harass or annoy.  Cf. Braley v. Campbell, 832 F.2d 1504, 1512 (10th Cir. 1987) (en banc) (rejecting subjective intent standard "as virtually impossible to apply" for fee awards under 28 U.S.C. § 1927).[7]

B.  Evidence of Malice or Intent to Harass or Annoy

The district court here did not make any express findings that the government's actions in this case manifested malice or an intent to harass or annoy, resting its fee award

---

the Hyde Amendment awards at issue here.

[7]     The Supreme Court has expressly rejected an inquiry into subjective intent in deciding questions of official immunity in the law enforcement context, replacing it with an objective inquiry into the legal reasonableness of the official action.  See Harlow v. Fitzgerald, 457 U.S. 800, 815-20 (1982); see also Whren v. United States, 517 U.S. 806, 811-13 (1996) (rejecting subjective intent test in Fourth Amendment context). It would be odd if against this background Congress intended an inquiry into the subjective motivations of prosecutors under the vexatiousness standard of the Hyde Amendment.  We do not address whether the "bad faith" test requires a subjective inquiry.

-24-

instead on the purported absence of credible evidence to support the charges. Under the standard articulated here, the absence of objective evidence of such improper motive renders the fee award inappropriate. The district court did, however, identify and criticize isolated conduct of the EPA and prosecution, and defendants suggest that this conduct suffices to prove vexatiousness and support the award in any event.

Defendants point to an array of government conduct both before the indictment and during litigation in an effort to demonstrate that the prosecution was indeed vexatious. As defendants contend, it is permissible for courts to consider the conduct of the investigation in order to provide a context in which to assess whether a prosecution was "vexatious" within the terms of the Hyde Amendment. However, the alleged conduct in this case, whether taken independently or collectively, either lacks sufficient record support or fails to rise to the level of conduct required to find vexatiousness. Therefore this tacit argument that the government proceeded with improper purposes does not succeed. We address the contentions in turn.

First, defendants point to the district court's conclusion that some samples taken during the October 21

inspection of the site exceeded the scope of the permission given by Knott. The validity of the order suppressing the afternoon samples is not before us, but the issue was close and the ultimate decision to suppress the evidence was by no means a foregone conclusion. In any event, the mere fact that EPA inspectors took samples exceeding the scope of permission hardly warrants an inference that their conduct was vexatious; their conduct could just as well have rested on an honest mistake of fact or misapprehension of the authority they had been granted, a possibility suggested by the fact that they subsequently provided a split sample from that afternoon to the defendants.

Second, defendants seize on the district court's determination that there was "credible evidence" that the annotation of some of the sampling results had been altered; they contend that such alteration is evidence of governmental abuse. As an initial matter, there is little evidence in the record that any of the annotations were altered apart from the 4 pH reading at Manhole #2 on October 21. Putting aside the question of support in the record, even assuming dubitante that some of the sample readings were deliberately and erroneously re-recorded, that alone would not necessarily be enough to

establish vexatious prosecution where properly recorded samples showed a violation. But here the district court did not render any findings as to the reasons why annotations were changed, just that there was "credible evidence" that they may have been. The annotations in the log may have been written over for any number of reasons, some as benign as the correction of a mistake. Nor is there any record evidence suggesting any improper conduct in recording the sample results. Even assuming that the fact of some alterations is supported in the record, since the existence of the purported alterations is equally open to benign and malign interpretations on the present record, it hardly provides sufficient evidence of vexatious conduct.

Third, defendants charge that the EPA agents continued to take readings at Manhole #1 despite their awareness of Knott's claim to ownership of the sewer line under Riverdale Street, and subsequently prosecuted them largely on the basis of pH readings taken at Manhole #1. This charge does not support any determination of vexatiousness. The question of ownership of the sewer under Riverdale Street, as discussed further below, was open to reasonable dispute, and the EPA was entitled to pursue charges based on discharges at the first manhole so long

as it had a legal argument that the public sewer began there. More importantly, as discussed below, the pH level of discharges at Manhole #1 provides relevant evidence of violations even if the public sewer begins at Manhole #2, regardless of ownership.

Next, defendants contend that the fact that the EPA and the U.S. Attorney issued press releases following the indictment reveals malice. The press releases simply state that the defendants were indicted and describe the charges for which the indictments were issued. Such standard press releases do not suggest any intent to vex.

Defendants also contend that vexatiousness is shown by the government's failure to produce automatically some evidence the court deemed exculpatory, where such production is required by a local court rule. The court deemed a certain log to be exculpatory because it showed a series of pH readings at Manhole #2 above 5.0 s.u. on the morning of November 7. While the government is correct that the existence of some discharges within the legal limit is not clearly exculpatory, the better practice would have been for the government to produce the logs as part of automatic discovery given the local rule. However, in this case, the logs were turned over in a timely fashion upon

-28-

a discovery request from the defendants, and the short delay did not prejudice the defendants. In these circumstances, given that the exculpatory nature of the evidence is questionable, the failure to produce the evidence automatically does not amount to vexatious behavior within the meaning of the Hyde Amendment.

Defendants also claim that the government unduly delayed dismissing the case following the district court's suppression order. The district court ruled on the suppression motion on February 16, 1999; the government moved to dismiss the case on April 23, 1999. Such a delay does not suggest vexatious conduct. The government is entitled to weigh carefully whether or not to appeal the exclusion of evidence and to assess carefully whether or not to continue the case in the absence of the excluded evidence. In doing so, the government is engaging in precisely the sort of prosecutorial decisionmaking that is its business, and assessing the strength of the remaining case requires some consideration. Indeed, the decision here to move for a dismissal of the indictment was by no means preordained by the suppression order, as the government had evidence with which it might have pressed its case even without the excluded evidence. We would not want the Hyde Amendment to deter the

prosecution from exercising its discretion to dismiss cases where it concludes that prosecution is no longer warranted.

Finally, defendants contend that the manner in which the EPA executed the November 7 search warrant evinces vexatiousness. The district court stated that the EPA brought "a virtual 'SWAT team'" to conduct the search and that the agents involved engaged in "humiliating" conduct. (The search involved the presence of 21 agents, some armed, who interviewed and videotaped employees.) 106 F. Supp. 2d at 180. However, any conclusion that the EPA agents engaged in unwarranted behavior in executing the search is not supported by the record. The affidavits of Knott and Agent Creavin contain conflicting statements regarding the search. But even crediting all of Knott's sworn allegations regarding the search, the conduct of the search does not amount to vexatious conduct. Knott alleges that the EPA brought 21 agents, some armed, that they engaged in "outrageous and disruptive" behavior in conducting the search, and that some of the seized documents were outside the scope of the search warrant. In an unsworn letter to the assistant U.S. attorney, Knott supplemented these charges, contending that the EPA did not show him the search warrant until the premises were

secured, that they interviewed Riverdale Mills employees both during the search and later in the day at their homes, that these interviews were videotaped, and that in one instance the agent holding the video camera held it too close to the face of the interviewee until another agent asked him to back up.

None of these contentions -- apart from the conclusory characterization of the conduct as "outrageous" -- set forth conduct that is properly deemed vexatious, at least absent more specific facts. There is nothing untoward about criminal investigative agents of the EPA wearing holstered firearms while in the field, nor about securing premises before showing the search warrant. That the EPA wanted to interview Riverdale Mills employees is also hardly surprising, as is the fact that the EPA wanted to record the interviews. It was, after all, a tip from an employee which started the whole investigation, and it appears that the employees knew the pretreatment system was not operating as required, and that Knott was aware of this. The record does not reflect any misconduct in the manner in which the interviews were carried out, or even provide any reason to suspect it, and the defendants opted not to provide affidavits from the interviewed employees. On the record before

the court, there was no basis to find that the EPA engaged in such unwarranted conduct in executing the warrant as to render its behavior vexatious within the meaning of the Hyde Amendment.[8]

The record simply does not reflect the sort of malice or prosecutorial misconduct toward which the Hyde Amendment was directed. While the government might have handled itself better in some of these instances, that does not render its conduct "vexatious." Rather, an award of fees for "vexatious" prosecution under the Hyde Amendment requires some evidence upon which a reasonable observer can conclude that the prosecution was based in malice or an intent to harass or annoy. The district court erred as a matter of law in applying a legal standard that would award fees under the Hyde Amendment in any case where the prosecution is ultimately deemed to have been without sufficient foundation.

C. Evidence to Support Prosecution

Of equal importance is that the district court's finding that there was no "credible evidence" upon which to pursue charges was clear error. The government had ample reason

---

[8] We bypass the question of whether one vexatious raid would render the pursuit of a criminal case "vexatious."

to investigate and pursue charges against the defendants, and indeed still had adequate cause to prosecute even after the suppression of evidence. Thus an award of attorneys' fees under the Hyde Amendment is clearly not warranted, given the failure to meet the first part of the test of vexatiousness: that the government's suit lacked either legal merit or factual foundation.

The EPA had ample reason to initiate an investigation of Knott and Riverdale Mills. In the summer of 1997, the EPA received an anonymous letter from an employee of the company indicating that the company was not complying with the pretreatment requirements set out in its agreement with the state, as embodied in its state permit to discharge industrial wastewater into the public sewer. Upon arriving to investigate this allegation on October 21, the EPA inspectors observed that, contrary to Knott's alleged representation that morning, the pretreatment system at the plant was not in operation. Indeed, although at the closing conference on the afternoon of October 21, the EPA inspectors discussed with Knott the fact that the pretreatment system was not operational and that low pH discharges into the public sewer were occurring as a result,

-33-

when the EPA returned to conduct the November 7 search, the pretreatment system was still not operating properly. Interviews with Riverdale Mills employees that day confirmed that the pretreatment system had been out of operation for several months and that Knott was aware that it was not functioning. Defendants do not contest the fact that the pretreatment system was not in operation on either day but rather resort to arguments that other processes would dilute the wastewater before it reached the public sewer.

In addition, there was considerable direct evidence of a Clean Water Act violation. As defendants acknowledge, a single knowing discharge of wastewater with pH below 5.0 s.u. into the public sewer is sufficient to prosecute as a Clean Water Act violation. Here, at the time the government sought the indictment, it had over fifty samples that it considered direct evidence of discharges below pH 5.0 s.u. For the first count, covering October 21, the EPA had 13 samples from Manhole #1 below pH 3.0 s.u. and one disputed sample at Manhole #2 at pH around 4.0 s.u. For the second count, covering November 7, the EPA had over 40 samples below pH 5.0 s.u., including three below pH 3.0 s.u., all taken at Manhole #1.

The district court discounted much of this evidence as immaterial, giving two reasons: first, much of it resulted from samples taken at Manhole #1; and second, much of it was later suppressed. The decision not to consider the government's evidence taken at Manhole #1 is flawed, in two respects. First, at the time the government sought the indictment, the ownership of the street where Manhole #1 is located remained in dispute, and the government had a good faith legal argument that the relevant point of discharge into the public sewers was the first manhole. Therefore it was entitled to pursue charges based on discharges at Manhole #1.

More importantly, the district court's decision to disregard the sampling results at Manhole #1 misapprehends or ignores the relationship between sampling data collected at the first manhole and the acidity of Riverdale Mills's discharges into the public sewer, even if the public sewer begins only at the second manhole. The prosecution had ample evidence that the defendant discharged highly acidic water at the first manhole on both days. Even if the relevant public sewer does not begin until the second manhole 100 yards away, these samples still provide evidence that the water ultimately discharged by the

defendants at the second manhole had a highly acidic content. That is particularly so in light of the EPA expert's conclusions. The EPA was not required to accept Knott's lay theory, not even advanced on appeal, that the slope of the pipes over that 100 yard distance ensured that pulses of highly acidic water would inevitably be neutralized by mixing with pulses of highly caustic water before they both hit Manhole #2. Nor was the EPA required to accept the later-advanced theory that the pipes were subject to so much groundwater infiltration that the groundwater would dilute the effluent down to an acceptable level over the short distance of 100 yards. By overlooking the bearing which the pH readings at the first manhole have on the acidity of discharges at the second, the district court committed clear error.

The defendants argue that the district court is free to accept or reject the conclusions of the EPA expert who stated that the groundwater infiltration rate would not sufficiently dilute highly acidic water within the 100 yard span of the sewer line under Riverdale Street. While this assertion may be true as to the ultimate factual determination, it misses the issue at stake in the application for fees under the Hyde Amendment,

which is whether the EPA was vexatious in deciding to proceed in its prosecution. Even if the court or jury did not ultimately credit the EPA expert's conclusions, there is no evidence in the record to suggest that that expert was so wantonly and obviously wrong that the EPA was not entitled to rely upon his determinations in proceeding. Indeed his determination may well be correct. For these reasons, the evidence of samples below pH 3.0 s.u. at Manhole #1 remains credible evidence upon which the EPA was entitled to pursue charges.

Second, in concluding that the prosecution lacked "any credible evidence," the district court erroneously discounted all the evidence that it had suppressed. For Hyde Amendment purposes, however, the court must assess the basis for pursuing charges from the perspective of the government at the time. Instead, the district court required undue prescience on the part of the government. The government was entitled, ab initio, to rely on the evidence subsequently suppressed in making its prosecutorial decision, provided it could articulate, in good faith, a reasonable position on the suppression issue.

There were genuine factual disputes regarding what happened on October 21, and the conditions which were imposed

upon the consent to the EPA inspection were, at the very least, ambiguous. The government was entitled to rely on its evidence so long as it had a good-faith basis for contending that the evidence was admissible. The suppression issue presented here was not so clear cut as to deprive the prosecution of a reasonable basis for believing that its evidence was admissible. An interpretation of the Hyde Amendment which effectively requires the government precisely to anticipate later evidentiary rulings, where reasonable grounds for disagreement exist, is untenable in light of the language and purposes of the Hyde Amendment.

Indeed, even after the suppression ruling, there remained an adequate evidentiary foundation for the prosecution, at least as concerns the second count. There were three readings below pH 3.0 at the first manhole on November 7, each of which, in conjunction with the testimony of the EPA expert, could provide an adequate foundation for a Clean Water Act charge. In addition, the EPA directly observed that the pretreatment system was not in operation on either day, as corroborated through employee interviews. Moreover, there was evidence the system had not been in operation for some time,

which Knott well knew. Although the EPA ultimately concluded that it would not proceed, there remained credible evidence to support a prosecution. Weighing the strength of the evidence and determining whether or not to prosecute are precisely the sorts of choices the government is entitled to make, based on information it has acquired through due diligence.

Since the EPA had a reasonably sufficient evidentiary basis upon which to pursue charges against the defendants, both before and even after the suppression ruling, and absent any finding or reason to believe that the government acted either out of malice or with any intent to harass or annoy, the fee award to Riverdale Mills constituted an abuse of discretion.

**IV.**

For these reasons, we <u>affirm</u> the denial of fees to Knott, <u>reverse</u> the grant of fees to Riverdale Mills, and remand the application for fees under the Hyde Amendment to the district court for dismissal, with prejudice.

<u>So ordered.</u> No costs are awarded.