PRYOR, Circuit Judge,
respecting the denial of rehearing en banc:
I reluctantly write this opinion respecting the denial of rehearing en banc to respond to the dissenting opinion that follows. Judge Henry Friendly once observed that the practice of publishing a dissent about a decision in which the dissenter “did not participate” and “the Court has declined to review ... en banc” is “of dubious policy.” United States v. New York, New Haven & Hartford R.R. Co., 276 F.2d 525, 553 (2d Cir.1960) (Friendly, J., concurring in denial of reh’g en banc, joined by Lumbard, C.J.). And Judge Raymond Randolph, who clerked for Judge Friendly, perhaps put it best: “[Djenials of rehearing en banc are best followed by silence. They should not serve as the occasion for an exchange of advisory opinions, overtures to the Supreme Court, or press releases.” Indep. Ins. Agents of Am. v. Clarke, 965 F.2d 1077, 1080 (D.C.Cir.1992) (Randolph, J.). But, alas, “dissents from denial of rehearing en banc are now routine.” Indraneel Sur, How Far Do Voices Carry: Dissents from Denial of Rehearing En Banc, 2006 Wis. L.Rev. 1315, 1317; see also Sahyers v. Prugh, Holliday & Karatinos, P.L., 603 F.3d 888, 889 (11th Cir.2010) (Edmondson, J., concurring in denial of reh’g en banc) (questioning “the fashion” of filing “dissents regularly when en banc rehearing is denied”).
*1239 The original panel opinion speaks for itself, but I write, as the author of that opinion, to set the record straight about a matter that the dissent misunderstands. The Hyde Amendment allows for the extraordinary remedy of invading the public fisc to pay an acquitted criminal defendant’s attorney’s fees, and this rare waiver of sovereign immunity applies only when a court determines that the entire “position of the United States was vexatious, frivolous, or in bad faith.” Pub.L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes). The “position” of the United States is expressed as a singular term for obvious reasons. Congress expected a court to assess the overall prosecution of a defendant and not base an award of fees only on discrete actions that took place during that prosecution. Traditional sanctions exist for discrete wrongs like discovery violations that occur during an otherwise reasonable prosecution, but an award of attorney’s fees under the Hyde Amendment is not one of those sanctions. The Hyde Amendment is concerned with wrongful prosecutions, not wrongs that occur during objectively reasonable prosecutions. The district court erred in when it held otherwise, and the dissent fails to grasp this distinction.
I. BACKGROUND
The panel opinion provides a thorough discussion of the facts underlying this appeal, United States v. Shaygan, 652 F.3d 1297, 1302-10 (11th Cir.2011), but some of those facts, which are unmentioned in the dissent, merit special review. Most notably, the United States began its investigation and prosecution of Ali Shaygan with more than good cause: it all started with a suspicious death.
On June 9, 2007, James Brendan Downey died from an overdose of various drugs including methadone and cocaine. An autopsy revealed that the level of methadone in Downey’s blood was alone enough to kill him. Two days before Downey died, Dr. Shaygan had prescribed methadone to Downey.
Downey’s girlfriend, Crystal Bartenfelder, testified that she had visited Shaygan’s office with Downey on June 7, 2007, and that Shaygan had not conducted any kind of physical examination of Downey. She testified that, during the same visit, Downey asked Shaygan for more oxycodone than he had previously been prescribed. She testified that Shaygan expressed concern that the increased amount of oxycodone would look suspicious, so Shaygan suggested methadone, which Downey accepted. Bartenfelder was with Downey the night he died, and she testified that he died in his sleep after taking the methadone.
After Downey’s death, the Drug Enforcement Administration conducted an undercover investigation of Shaygan. Two local police officers posed as prospective patients to determine how easily they could obtain prescriptions of controlled substances from Shaygan. They recorded their conversations and obtained prescriptions for several controlled substances during their first visits to Shaygan’s office. The officers presented no medical records and were given minimal physical examinations during these visits.
On February 8, 2008, the government filed an indictment that charged in 23 counts that Shaygan had distributed and dispensed controlled substances outside the scope of professional practice and not for a legitimate medical purpose in violation of federal law. See 21 U.S.C. § 841(a)(1). When the indictment was filed, the government had not yet identified any of Shaygan’s other patients. On February 11, 2008, Administration agents *1240 arrested Shaygan and obtained his consent to search his office. The agents seized patient files and Shaygan’s day planner. The agents used information from the day planner to identify additional patients of Shaygan, and evidence regarding these patients formed the basis for additional counts contained in a superseding indictment filed on September 26, 2008.
Before trial began, Sean Cronin, one of the two prosecutors on the case, suspected that Shaygan’s defense team might be tampering with potential witnesses. He and his fellow prosecutor, Andrea Hoffman, spoke with their supervisor at the United States Attorney’s Office, Karen Gilbert, who permitted Drug Enforcement Agent Christopher Wells to ask two potential government witnesses to record calls with the defense team. Gilbert instructed Cronin that she would be responsible for the collateral investigation and that Cronin and Hoffman should take no part in the investigation. Gilbert also instructed Agent Wells not to disclose information about the collateral investigation to Cronin or Hoffman. Agent Wells spoke with the two witnesses, who agreed to record conversations with the defense team. One of the witnesses, Carlos Vento, later signed a confidential informant agreement. Agents filed DEA-6 reports that documented that Vento and the other witness, Trinity Clendening, had recorded conversations with the defense team and that Vento had signed a confidential informant agreement.
At a status conference the week before trial, the district court ordered the government to turn over any DEA-6 reports so that the court could read them before trial to determine if they contained any exculpatory material that should be given to the defense under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Two days later, Cronin filed DEA-6 reports for several witnesses. Cronin had asked Agent Wells for all DEA-6 reports, but Cronin did not ask specifically for those generated in the collateral investigation. The government did not produce the DEA-6 reports related to the collateral investigation.
At trial, the government presented a wealth of evidence to suggest that Shaygan had distributed and dispensed controlled substances outside the scope of professional practice and not for a legitimate medical purpose in violation of federal law. See Shaygan, 652 F.3d at 1305-06. Downey’s girlfriend testified that Shaygan, without conducting any physical examination, prescribed Downey the methadone that killed Downey two days later. Id. at 1305. Three of Shaygan’s former associates testified that Shaygan routinely wrote them prescriptions for controlled substances without any legitimate medical purpose. Id. The two undercover police officers testified. The government played tape recordings of their conversations with Shaygan for the jury, and the officers explained how Shaygan had provided them prescriptions for controlled substances. Id. Four of Shaygan’s former patients gave testimony consistent with the prosecution’s theory. Id. at 1305-06. Two other patients gave testimony that did not support the prosecution’s theory, but the patients’ earlier statements and evidence from their medical files did. Id. at 1306.
During the cross-examination of Clendening, Clendening mentioned a recording he had of a conversation with one of Shaygan’s attorneys. The next day, the government explained to the court the recordings and the collateral investigation. The district court allowed the defense to call Vento and Clendening again for cross-examination. The court instructed the jury that the defense did nothing wrong and that “the United States had acted improperly in not turning over the necessary *1241 discovery materials and also by allowing recordings to occur in the first place.” Id. at 1307-08.
Shaygan was represented by an elite defense attorney, and Shaygan’s superb counsel took advantage of the opportunity to focus the attention of the jury on the alleged misconduct by the government in the collateral investigation. During the new cross-examinations of Vento and Clendening, Shaygan’s counsel accused them of not telling the whole truth to the jury because they had not revealed that they had been asked to record conversations with the defense team. In closing argument, Shaygan’s counsel compared the alleged misconduct by the government to the Salem witch trials. Shaygan’s counsel reminded the jury that the district court had instructed them that the “United States [had] acted improperly,” and argued that the jurors had been misled by the government. Shaygan’s counsel argued that innocent women had been convicted and hung in the Salem witch trials “because there were no jurors,” and he urged the jury to say “no” and to “make sure the Salem, Massachusetts[,] witch trials never happen again.” Id. at 1308.
The jury returned a verdict of not guilty on all counts. Immediately after the jury was dismissed, the district court ordered the government to appear on the following Monday. The court stated that it would “hear alternative requests for sanctions,” including whether a sanction in the form of attorney’s fees and costs should be awarded under the Hyde Amendment. Id. The court at no time stated that it was considering sanctions against the individual prosecutors.
The district court granted Shaygan’s motion under the Hyde Amendment and ordered the United States to reimburse Shaygan in the amount of $601,795.88 for attorney’s fees and costs from the date of the superseding indictment. The court held that the superseding indictment, though supported by newly discovered evidence, was filed in bad faith because it came after a heated discussion between Cronin and Shaygan’s counsel. The court also highlighted the discovery violations related to the collateral investigation and held that “discovery violations in the course of a prosecution can form a basis for the award of attorney’s fees under the Hyde Amendment.” Id. at 1310. The district court virtually ignored the substantial evidence that supported the charges against Shaygan.
Without providing notice to the prosecutors that they were facing individual sanctions and without even hearing from Hoffman, the district court also entered a public reprimand “against the United States Attorney’s Office and specifically against AUSA Karen Gilbert, Sean Cronin, and Andrea Hoffman.” Id. The district court ordered the United States Attorney’s Office to provide “the contact information for the relevant disciplinary body of the Bar(s) of which AUSA Cronin and Hoffman are members,” and stated that it would request that disciplinary action be taken against Cronin and Hoffman. Id. The prosecutors were never given an opportunity to contest the allegations the court made against them.
Although the dissent mentions the “vital and laudatory role,” Dissenting Op. at 1245, of prosecutors and opines that the district judge “performed his assigned role with great care,” id. at 1246, the dissent neglects to mention the grievous wrong that the district court committed against the trial prosecutors, Sean Cronin and Andrea Hoffman, in this case. By ignoring this matter, the dissent understandably refrains from defending the inquiry by the district court that led to the public reprimand of these prosecutors without afford *1242 ing them the two rudiments of the fundamental civil right of due process: notice and an opportunity to be heard. About that error, the panel opinion was unanimous. See Shaygan, 652 F.3d at 1318-19, 1326. We vacated the sanctions by the district court and refused to affirm any finding that the trial prosecutors had engaged in any misconduct. Id.
The dissent does not contest our ruling, but instead ignores it altogether. The dissent states that “this Court’s opinion in Shaygan does not set aside the findings of fact that undergirded Judge Gold’s Hyde Amendment analysis. Indeed, the opinion assumes that the prosecutors did and said everything that Judge Gold found to be true. Neither does it point to error in Judge Gold’s findings of fact that the prosecutors acted in violation of their ethical obligations as representatives of our government.” Dissenting Op. at 1250. The panel opinion did not need to decide whether the findings of alleged misconduct as they related to the award of fees under the Hyde Amendment were clearly erroneous, as the government argued, because the alleged misconduct, even if true, could not constitute “the position of the United States.” But the findings of misconduct, as they were used to support the reprimands of the prosecutors, were vacated by the unanimous panel as “unreliable because [they] w[ere] developed, after all, without affording either [prosecutor] due process.” Shaygan, 652 F.3d at 1319. The panel refused as follows to endorse any findings of misconduct: “It is not apparent to us that either attorney necessarily violated any ethical rule or any constitutional or statutory standard.” Id. These public servants deserve better.
II. DISCUSSION
When it awarded Shaygan fees under the Hyde Amendment, the district court erred in two ways. First, as the panel opinion explains more thoroughly, the superseding indictment was not brought in “bad faith” because there was an objectively reasonable basis for bringing it. See Shaygan, 652 F.3d at 1312-15. That is, the government uncovered new evidence of additional unlawful activity when agents discovered Shaygan’s day planner. The day planner led the agents to new patients and witnesses, and based on information from these patients, the government filed the superseding indictment. Shaygan never denied that the superseding indictment was supported by new and sufficient evidence. The prosecutors were doing their job, and when “[w]hen public officials do their jobs, it is a good thing.” Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir.1996). Second, the district court erred when it held that discovery violations alone can support an award of attorney’s fees under the Hyde Amendment. The term “position of the United States” refers broadly to the overall litigating position of the United States, not to isolated instances of misconduct in an otherwise justifiable prosecution. Because the prosecution of Shaygan was objectively reasonable, the district court did not have discretion to award attorney’s fees under the Hyde Amendment.
The panel opinion held that the Hyde Amendment is reserved for a specific kind of wrong. The Amendment applies when the government brings a prosecution that is objectively wrong, not when the prosecutor commits wrongs during a reasonable prosecution. Although the dissent expresses fear that the panel opinion will leave courts without the power to check prosecutorial misconduct, checks on prosecutorial misconduct existed long before the Hyde Amendment and remain in force. For example, as a sanction of prosecutors for discovery violations, a district court can *1243 prohibit the government from introducing the undisclosed evidence or “enter any other order that is just under the circumstances.” Fed.R.Crim.P. 16(d)(2)(C)-(D). A court also can publically reprimand prosecutors for misconduct, though it must afford them due process, which the district court failed to do here. But a court can grant the extraordinary remedy of an award of attorney’s fees only when it establishes that a wrongful prosecution has occurred. No comparable remedy existed before the enactment of the Hyde Amendment. The dissent suggests that “Congress sought to respond to patterns of prosecutorial misconduct” when it used the phrase “the position of the United States,” Dissenting Op. at 1251, as if Congress intended the Hyde Amendment to supplant extant remedies for prosecutorial misconduct. But that interpretation makes no sense.
Our interpretation of the Hyde Amendment is consistent with the decision of the Sixth Circuit in United States v. Heavrin, 330 F.3d 723 (6th Cir.2003). In that case, the district court had awarded a defendant attorney’s fees and costs under the Hyde Amendment on the ground that some of the charges against him were frivolous, but the Sixth Circuit reversed. The Sixth Circuit ruled that the district court had erred when it awarded attorney’s fees and costs without “assessing] the case as an inclusive whole.” Id. at 731. The Sixth Circuit reasoned that “[a] count-by-count analysis” was inconsistent with the Hyde Amendment because its plain language refers to the “position” of the United States in the singular. Id. at 730. It concluded that, “[w]hen assessing whether the position of the United States was vexatious, frivolous, or in bad faith, the district court should ... make only one finding, which should be based on the case as an inclusive whole.” Id. (internal quotation marks omitted).
The dissent misinterprets the panel opinion and states that it “collapses the Hyde Amendment inquiry into only a single question: were the charges against the defendant baseless?” Dissenting Op. at 1250. But the panel opinion holds that the appropriate inquiry under the Hyde Amendment is as follows: was it reasonable to prosecute this case? Plainly these are different questions.
It is not difficult to imagine a prosecution that begins with objectively reasonable charges and later becomes unreasonable to prosecute. For example, the government could bring a case that was objectively reasonable at the outset and later discover evidence that proved that a defendant was not guilty. If the government continued to prosecute the case, the litigating position of the United States would be in bad faith. Nothing in the panel opinion contradicts this interpretation.
The dissent states that the Hyde Amendment requires a court to consider “a case as an inclusive whole,” Dissenting Op. at 1251, and “not fail to see the forest for the trees,” id., but the dissent then rests its case on alleged discovery violations related to two witnesses’ roles in a collateral investigation. The dissent fails to explain how these alleged wrongs represent the entire “position of the United States.” The dissent ignores the wealth of evidence that supported both the initial and superseding indictments of Shaygan, including documentary evidence and testimony from former employees, former patients, and two undercover police officers. The dissent cautions against taking a narrow view of the case, but then makes that very mistake.
The dissent’s argument is based heavily on a snippet of legislative history of the Hyde Amendment, but that snippet pro *1244 vides a perfect example of why, “when we consult legislative history, we [must] do so with due regard for its well-known limitations and dangers.” Garcia v. Vanguard Car Rental USA Inc., 540 F.3d 1242, 1247 (11th Cir.2008). The dissent notes that, when Representative Henry Hyde introduced the first version of the Hyde Amendment, he spoke of instances when prosecutors “keep information from [the defendant] that the law says they must disclose,” “hide information,” and “suborn perjury.” Dissenting Op. at 1251 (quoting 143 Cong. Rec. H7786-04, at H7791 (daily ed. Sept. 24, 1997) (statement of Rep. Hyde)). The dissent reasons that “it seems Congress clearly understood that the presence of probable cause does not, and should not, excuse patterns of gross prosecutorial misconduct.” Dissenting Op. at 1251.
The dissent’s argument about this legislative history is unavailing for at least two reasons. First, Congressman Hyde’s statements were made in support of the first version of the Amendment, which was patterned after the Equal Access to Justice Act. See 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde). In that earlier version, any acquitted defendant would have been able to receive attorney’s fees unless the government could establish that its position was “substantially justified.” United States v. Gilbert, 198 F.3d 1293, 1300 (11th Cir. 1999) (quoting 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde)). “[I]n response to concern that the initial version of the Hyde Amendment swept too broadly, the scope of the provision was curtailed significantly” by replacing the old standard with the current standard. Id. at 1302. Thus, Congressman Hyde’s statements were made in support of a more lenient standard that Congress rejected. His statements tell us little about the “daunting obstacle” that Congress ultimately adopted. Id. Second, even if Congressman Hyde’s statements were relevant, when taken as a whole, they support the view that the Amendment applies only to wrongful prosecutions, not isolated wrongs during reasonable prosecutions. Congressman Hyde warned against the circumstances where the government “charges you with a criminal violation, even gets an indictment and proceeds, but they are wrong. They are not just wrong, they are willfully wrong, they are frivolously wrong.” 143 Cong. Rec. H7786-04, H7791 (Sept. 24, 1997) (statement of Rep. Hyde). The government might engage in various types of prosecutorial misconduct, “[b]ut they lose the litigation, the criminal suit, and they cannot prove substantial justification. In that circumstance ... you should be entitled to your attorney’s fees reimbursed and the costs of litigation.... That, my friends, is justice.” Id. (emphasis added). Congressman Hyde’s statements referred to instances where an entire prosecution is wrong, not instances where a prosecutor commits only a discovery violation or only dislikes a defendant.
The dissent also argues that “the First Circuit has recognized that, under the Hyde Amendment, an award may properly be based on ‘an array of government conduct both before the indictment and during litigation,’ ” Dissenting Op. at 1251 (quoting United States v. Knott, 256 F.3d 20, 31 (1st Cir.2001)), but the dissent’s assertion is misleading to the extent that it suggests that Knott allows an award under the Hyde Amendment whenever a defendant’s right to discovery is violated. In the same paragraph quoted by the dissent, the First Circuit stated that it would “consider the conduct of the investigation in order to provide a context in which to assess whether a prosecution was ‘vexatious.’ ” Knott, 256 F.3d at 31 (emphasis added). Again, *1245 the proper inquiry encompasses the whole prosecution—the forest, not the trees. The First Circuit concluded in Knott that because “[t]he government had ample reason to investigate and pursue charges against the defendants ... an award of attorneys’ fees under the Hyde Amendment [wa]s clearly not warranted.” Id. at 34.
If, as the dissent argues, the Hyde Amendment was meant “to respond to patterns of prosecutorial misconduct,” Dissenting Op. at 1251, then Congress’s requirement that a defendant be acquitted before an award may be even considered would be unnecessary. If the alleged discovery violations in Shaygan’s prosecution were the kinds of wrongs Congress sought to address with the Hyde Amendment, then Shaygan should be entitled to attorney’s fees whether the jury found him guilty or not. An award of fees, after all, would be a powerful check on prosecutorial power. But Congress did not open the federal treasury to convicted felons.
The extraordinary remedy provided by the Hyde Amendment applies only when a prosecution, assessed as an inclusive whole, is wrong. The prosecution of Shaygan, triggered by the death of his patient and supported by substantial evidence, was not wrong. The Hyde Amendment does not entitle Shaygan to an award of fees of $601,795.88.