[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 29, 2011
JOHN LEY
CLERK

No. 09-12129
_____

D. C. Docket No. 08-20112-CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

ANDREA G. HOFFMAN,
SEAN PAUL CRONIN,

Interested-Parties-Appellants,

versus

ALI SHAYGAN,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(August 29, 2011)

Before EDMONDSON, PRYOR and BARKSDALE,[*] Circuit Judges.

PRYOR, Circuit Judge:

The stakes in this appeal are high: they involve the sovereign immunity of the United States, the constitutional separation of powers, and the civil rights and professional reputations of two federal prosecutors. The United States appeals an award of $601,795.88 in attorney's fees and costs under the Hyde Amendment, Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes), and two attorneys, Sean Cronin and Andrea Hoffman, appeal public reprimands entered against them based on their work as Assistant United States Attorneys in an underlying criminal action marked by hard adversarial tactics. A grand jury indicted Dr. Ali Shaygan for distributing and dispensing controlled substances outside the scope of professional practice, 21 U.S.C. § 841(a)(1). The Drug Enforcement Administration had conducted an undercover investigation of Shaygan after one of his patients died from a lethal combination of prescription and illegal drugs. After Shaygan's arrest, the government discovered additional evidence of violations of federal law, and Shaygan moved to suppress statements he had made to federal agents who, Shaygan contended, had violated his right to counsel. In response to that motion,

---

[*] Honorable Rhesa H. Barksdale, United States Circuit Judge for the Fifth Circuit, sitting by designation.

2

Cronin warned Shaygan's lead counsel of an impending "seismic shift" in the prosecution of Shaygan. Soon afterward, the government filed a superseding indictment with additional charges and supported those charges at trial with the testimony of several witnesses and documentary evidence. Near the end of trial, the district court allowed a second cross-examination of two witnesses for the government after it came to light that those witnesses had cooperated in a collateral investigation about potential witness tampering by members of the defense team. The district court instructed the jury that the reopening of cross-examination was necessary to address misconduct by the government. In closing argument, Shaygan's counsel compared that alleged misconduct to the Salem witch trials. After the jury acquitted Shaygan of all charges, the district court held an inquiry about sanctions under the Hyde Amendment. The district court found that the prosecutors "acted vexatiously and in bad faith in prosecuting Dr. Shaygan for events occurring after the original indictment was filed." The district court awarded Shaygan attorney's fees and costs, publicly reprimanded Cronin and Hoffman, and referred those attorneys to disciplinary authorities.

The United States, Cronin, and Hoffman contend that the district court abused its discretion and committed fundamental errors. The United States argues that the district court erroneously ruled that the superseding indictment was

3

"brought vexatiously, in bad faith, or so utterly without foundation in law or fact as to be frivolous," United States v. Gilbert, 198 F.3d 1293, 1299 (11th Cir. 1999), and that the district court erroneously concluded that an award of attorney's fees and costs under the Hyde Amendment could be supported by discrete incidents of bad faith, such as discovery violations, without regard to the overall litigating position of the United States. Cronin and Hoffman argue that the district court violated their right to due process, under the Fifth Amendment, when it denied them notice and an opportunity to be heard before it entered public reprimands of them.

We agree with these arguments. The district court abused its discretion when it imposed sanctions against the United States for a prosecution that was objectively reasonable, and the district court violated the constitutional right to due process of the two lead prosecutors, Cronin and Hoffman, when it denied them notice of any charges of misconduct and an opportunity to be heard. We vacate both the award of attorney's fees and costs against the United States and the public reprimands of Cronin and Hoffman, but we deny the request of Cronin and Hoffman that we reassign the case to a different district judge at this stage.

4

# I. BACKGROUND

We address the background of this appeal in two parts. First, we discuss the prosecution of Shaygan and the collateral investigation of witness tampering. Second, we discuss the sanctions hearing, the award of attorney's fees and costs under the Hyde Amendment, and the public reprimands of Cronin and Hoffman.

*A. The Prosecution of Shaygan and the Witness Tampering Investigation*

On June 9, 2007, a patient of Dr. Ali Shaygan, James Brendan Downey, died from an overdose of various drugs including methadone and cocaine. Shaygan had prescribed methadone to Downey two days before his death. An autopsy revealed that the level of methadone in Downey's blood alone was enough to kill him.

After Downey's death, the Drug Enforcement Administration conducted an undercover investigation of Shaygan. Matthew Drake and Paul Williams, local police officers, posed as prospective patients of Shaygan to determine how easily they could obtain prescriptions of controlled substances. Drake and Williams recorded their conversations and obtained prescriptions for several controlled substances on their first visits to Shaygan. The officers presented no medical records and were given minimal physical examinations.

On February 8, 2008, the government filed an indictment that charged in 23 counts that Shaygan had distributed and dispensed controlled substances outside

the scope of professional practice and not for a legitimate medical purpose in violation of federal law. 21 U.S.C. § 841(a)(1). When the indictment was filed, the government had not yet identified any of Shaygan's other patients. On February 11, 2008, Administration agents arrested Shaygan and obtained his consent to search his office. The agents seized patient files and Shaygan's day planner.

On May 14, 2008, Shaygan filed a motion to suppress statements made at the time of his arrest. In the motion, Shaygan alleged that, "[d]espite Dr. Shaygan's repeated, unequivocal requests to speak with a lawyer, the agents continued to interrogate him, ignoring his requests as if they did not exist." He also alleged that an agent "us[ed] scare tactics and repeatedly ma[de] clicking noises with his firearm[] . . . [and] brandished his firearm in front of Dr. Shaygan, intimidating him." The government filed a response that contested the factual allegations in the motion to suppress. Instead of a clear request for an attorney, the government alleged that Shaygan asked, "[S]hould I call my attorney?" or "[D]on't I need to call my attorney?" According to the government, Shaygan was advised that he could either invoke his right to counsel and not answer any questions or he could choose to cooperate, and he stated that he wanted to cooperate and answered questions.

6

The government determined from Shaygan's day planner that he had met with Downey and several additional patients, including Andrew Gribben and Courtney Tucker, on the same day at a Starbucks coffee store. An Administration agent interviewed one of Shaygan's patients, Carlos Vento, on July 29, 2008. According to an Administration DEA–6 report, Vento stated that Shaygan had offered to pay him and another patient, Trinity Clendening, if they kept silent about Shaygan's role in Downey's death.

On July 31, 2008, the parties participated in a discovery conference at which the lead prosecutor confronted the lead defense attorney about the motion to suppress. As the parties argued about which version of the facts was correct, the lead prosecutor, Sean Cronin, stated to Shaygan's lead attorney, David Markus, that pursuing the motion to suppress would result in a "seismic shift." Soon afterward, Markus had Shaygan take a polygraph test.

The Administration interviewed Clendening on August 8, 2008, and he corroborated Vento's accusations about Shaygan's offer to pay for their silence. On August 13, 2008, the Administration interviewed Gribben, who stated that he and a friend, David Falcon, had received prescriptions from Shaygan without medical examinations. Although the government was initially unable to locate Falcon, it eventually found him, and he testified at trial.

The Administration interviewed Tucker on August 15, 2008, and she identified her boyfriend, Wayne McQuarrie, as an additional patient of Shaygan. According to a DEA-6 report prepared by Administration Agent Christopher Wells about Tucker's interview, Tucker made positive statements about Shaygan, including that he "conducted a thorough examination" and "seemed very interested in her well being." The DEA-6 report also contained negative statements attributed to Tucker concerning Shaygan, including that he "seemed to become more interested in making money than addressing her medical condition or improving her overall health during the year and a half that she purchased prescriptions from him." Soon after Agent Wells interviewed Tucker, defense investigator Michael Graff spoke with Tucker on the telephone. Graff later explained in an email to Shaygan's attorneys that Tucker thought that Agent Wells had tried to put a negative spin on her statements about Shaygan.

At a hearing on the motion to suppress on August 26, 2008, Markus recounted Cronin's "seismic shift" comment and related it to an abandonment of plea negotiations and a change in prosecutorial tactics: "[Cronin] told me that . . . if we were to litigate these issues, there was going to be no more plea discussions. . . . [I]f I went after his witnesses, and to use his words[,] there would be [a] seismic shift in the way he would prosecute the case."

8

On September 17, 2008, Administration agents interviewed McQuarrie, Vento, and Clendening, and on September 26, 2008, the government filed a superseding indictment that contained 141 counts. The additional counts in the superseding indictment alleged additional charges based on the newly identified patients. The government filed the superseding indictment only nine days after Administration agents had interviewed McQuarrie for the first time.

A magistrate judge recommended that Shaygan's statements following his arrest should be suppressed because he had invoked his right to counsel. The magistrate judge discredited the testimony of Administration agents in part because Cronin had prepared the agents together for the hearing. The magistrate judge found a defense witness's testimony more credible. That witness stated that he heard Shaygan ask, "[M]ay I please have my lawyer?" The defense witness did not testify that repeated requests were made; nor did the witness testify that agents used scare tactics to intimidate Shaygan. The district court later adopted the magistrate judge's report and recommendation.

After Tucker and McQuarrie were subpoenaed to testify as government witnesses at trial, Tucker called Agent Wells and expressed confusion about why she would be testifying for the prosecution. Tucker sought reassurance from Agent Wells that she and McQuarrie would not be portrayed as drug addicts.

Immediately after the conversation, Agent Wells called Cronin and said that he was concerned that Tucker was "going south" as a witness and was showing signs of reluctance in cooperating with the government. Agent Wells did not tell Cronin that he was concerned about potential witness tampering by the defense team; Cronin later acknowledged that it was his idea during the phone call to explore the possibility of a witness tampering investigation.

Cronin and his fellow prosecutor, Andrea Hoffman, spoke with Karen Gilbert, then chief of the narcotics section of the United States Attorney's Office, and informed her about Tucker's telephone call to Agent Wells. Cronin had earlier called an attorney at the Enforcement Operations Office of the Department of Justice to determine whether the United States Attorney's Office needed the approval of the Department to record telephone calls with members of the defense team. The attorney at the Department told him that the Office did not need approval, and Cronin reported this opinion to Gilbert. Gilbert agreed that it would be permissible to ask potential government witnesses, Vento and Clendening, to record calls with the defense team.

Gilbert instructed Cronin that she would be responsible for the collateral investigation and that Cronin and Hoffman should take no part in the investigation. Gilbert also instructed Agent Wells not to disclose information about the collateral

investigation to Cronin or Hoffman, but she failed to advise the Administration that Agent Wells was involved in both the main case and the collateral investigation. Gilbert failed to comply with an internal policy of the United States Attorney's Office that the United States Attorney be notified before the commencement of an investigation of an attorney.

Cronin called Agent Wells and told him to allow Vento and Clendening to record calls with the defense team, and Cronin said that, from that day forward, he would have no involvement in the collateral investigation. Vento later recorded a conversation with defense investigator Graff and reported the contact to Agent Wells. Agent Wells called Cronin and told him that Vento had recorded a call. Agent Wells contended that he called Cronin only because he was unable to reach Gilbert.

The next day, Agent Wells and Gilbert listened to Vento's recording, and Gilbert determined that it contained no evidence of witness tampering. But Gilbert decided to continue the investigation. Soon afterward, Gilbert assigned another Assistant United States Attorney, Dustin Davis, to the collateral investigation. Agent Wells later produced a DEA-6 report about both his earlier conversation with Tucker and Vento's recording of Graff.

Later, Agent Wells spoke with Clendening about a recording he had made of

11

a conversation with defense attorney Markus. Clendening reported that he had been able to record only a small portion of the conversation before his recording device became disconnected. Agent Wells later stated that he did not listen to Clendening's recording or report the content of Clendening's conversation with Markus to either Cronin or Hoffman. Clendening also recorded a second conversation with Markus that later came to light in open court; Clendening had not told Agent Wells about this second recording.

The Administration later reassigned the collateral investigation from Agent Wells to Agent James Brown. Agent Brown then called Vento and Clendening to tell them that they would not be permitted to record future conversations without first executing agreements to be confidential informants. The next day, Vento signed a confidential informant agreement, but Clendening never met with Agent Brown and did not sign an agreement. Agent Brown prepared a DEA-6 report about the confidential informant agreement with Vento. Cronin and Hoffman later called Agent Brown to inform him that the trial was going to begin in eight days.

At a status conference the week before trial, the district court ordered the government to turn over any DEA-6 reports so that the court could read them before trial to determine if they contained any exculpatory material that should be given to the defense under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963).

12

Two days later, Cronin filed DEA-6 reports for several witnesses. Cronin had asked Agent Wells for all DEA-6 reports, but did not ask specifically for those generated in the collateral investigation. The government did not produce the DEA-6 report of Agent Wells's interview of Tucker that had prompted the collateral investigation or Agent Brown's DEA-6 report of Vento's confidential informant agreement.

Trial began on February 17, 2009, and the first witness for the government was Downey's girlfriend, Crystal Bartenfelder. Bartenfelder testified that she had visited Shaygan's office with Downey and that Shaygan had not conducted any kind of physical examination of Downey. She testified that, during the same visit, Downey asked Shaygan for more oxycodone than he had previously been prescribed. She testified that Shaygan expressed concern that the increased amount of oxycodone would look suspicious, so Shaygan suggested methadone, which Downey accepted. Bartenfelder was with Downey the night he died, and she testified that he died in his sleep after taking the methadone.

Three of Shaygan's former associates testified for the government. Shaygan's former business partner, Michael Marchese, testified that Shaygan provided him prescriptions for controlled substances whenever he asked, without legitimate medical reasons, and he testified that Shaygan falsified medical records.

Marchese also testified that he purchased pills directly from Shaygan and then resold the pills. Amber Herring, one of Shaygan's nurses, testified that Shaygan wrote prescriptions for her for no charge with the understanding that Herring would give Shaygan half of the pills once she filled the prescription. Wilberg Guzman, Shaygan's former office assistant, testified that Shaygan provided prescriptions in Guzman's name and had Guzman fill the prescription with money Shaygan gave him and then deliver the pills to Shaygan.

The police officers who had posed as patients, Drake and Williams, also testified. The government played tape recordings of their conversations with Shaygan for the jury. Drake and Williams explained how Shaygan had provided them prescriptions for controlled substances.

The government also presented testimony from patients the government discovered after the first indictment had been filed and whose testimony supported the charges added in the superseding indictment. Vento testified that he called Shaygan after Downey died to tell him that Downey's brother was angry that Downey had taken an overdose of medication that Shaygan had prescribed. Vento stated that he and Clendening later visited Shaygan's office in Miami and told Shaygan that the Administration had interviewed Downey's girlfriend and that the Administration knew that Shaygan had been meeting with patients at a Starbucks.

14

Vento testified that, after he informed Shaygan that he might be investigated, he watched Shaygan add information, such as weight and blood pressure measurements, that had been missing from Downey's medical file. The government presented evidence of several prescriptions Shaygan wrote for Vento that day, and Vento testified that Shaygan told him and Clendening that they did not need to pay for doctor visits again. Guzman also testified that Shaygan instructed him not to charge Vento for office visits because Vento was going to do landscaping work for him. Vento testified further that, when he visited Shaygan again four days later, Shaygan wrote a prescription that was intended for Vento's wife, but was actually written for Vento, even though Shaygan had not performed a medical examination on Vento's wife. Vento's wife testified and corroborated Vento's story. Clendening testified that he was not charged for his visit to Shaygan's office in exchange for not talking about what was said in the office regarding Downey's death and Shaygan's practices. The government presented a page from Shaygan's day planner to establish that Vento and Clendening had not been charged for their visit to Shaygan on the day in question. Shaygan admitted that he did not charge Vento or Clendening for their visit that day, but he contended that he did not charge them for the visit because he "felt badly" about Downey's death, not to ensure their silence.

15

Neither Tucker's nor McQuarrie's testimony supported the prosecution's theory, but their earlier statements and evidence from their medical files did. Tucker testified that Shaygan was attentive and thorough. Tucker denied making negative statements about Shaygan—such as he seemed to be more interested in making money than in addressing her overall medical condition—that were attributed to her in the DEA-6 report that Agent Wells prepared after he interviewed her. McQuarrie testified that Shaygan reviewed his medical history and performed physical examinations. McQuarrie testified that Shaygan seemed more concerned with his well-being than with money, and when the government attempted to impeach McQuarrie's testimony with his earlier statements to Administration agents, he stated that he could not recall whether he had answered the question differently. The government introduced the medical files of Tucker and McQuarrie, which contained prescriptions for several months without any record of corresponding medical evaluations.

Two other patients who had been identified after Shaygan's arrest, Gribben and Falcon, testified in support of the charges in the superseding indictment. Gribben testified that he visited Shaygan because Gribben had heard that Shaygan would provide prescriptions for whatever pain pills a patient wanted. Gribben testified that he met with Shaygan at a Starbucks on a few occasions. At these

16

appointments, which lasted only about five to ten minutes, Gribben paid Shaygan and received the prescriptions; Shaygan did not perform a physical examination. Gribben admitted that he was not going to Shaygan for pain, but because he had a drug addiction. Falcon testified that Gribben introduced him to Shaygan. Falcon's first appointment with Shaygan was at a Starbucks where he received prescriptions without a physical examination. Falcon also testified that he later visited Shaygan at his office on multiple occasions and received prescriptions even though he never had a magnetic resonance image despite Shaygan's request that he obtain one. Falcon testified that he stopped seeing Shaygan and moved out of state because he was addicted to pain killers and "it was [too] easy for [him] to obtain medication."

The defense presented its own witnesses who testified that Shaygan treated them for non-pain management reasons, and Shaygan testified in his own defense. The defense also established its case by impeaching the credibility of the witnesses for the government.

During the cross-examination of Clendening on February 19, 2009, Shaygan's counsel, Markus, asked Clendening if he recalled a telephone conversation in which Clendening told Markus that he would have to pay him for his testimony, and Clendening responded, "No. I got it on a recording at my house." Markus did not immediately respond to this statement about a recording,

17

nor did the government mention it on redirect.

On the next day of trial, Gilbert appeared before the court to disclose the recording of conversations by Vento and Clendening. Gilbert testified at the sanctions hearing that she first heard about the existence of the recording mentioned by Clendening when she was at a restaurant on the evening of February 19, 2009, with a group of people that included Cronin and Hoffman. After Gilbert revealed the existence of the collateral investigation, Shaygan moved for a mistrial. The district court declined to rule on Shaygan's motion for a mistrial, but instead ordered the government to produce affidavits from anyone with knowledge of the matter. The government provided the affidavits over the next few days. Shaygan later filed a motion to dismiss the indictment.

The government argued that the fair remedy for the prosecution's failure to reveal that Vento and Clendening were confidential informants was to recall those two witnesses for further cross-examination. The government proposed that the jury should be given "a limited instruction . . . explaining that the recall is not through any fault of the defendant, but pointing out that certain materials were turned over late by the Government to[] . . . allay[] Mr. Markus' concern that the jury will blame the defense." Shaygan initially argued that, if the court declined to dismiss the indictment or grant a mistrial, the only fair remedy was to strike the

18

testimony of Vento and Clendening and "explain to the jury about the misconduct and about the misrepresentations to them about these witnesses."

The district court ruled that it was not going to strike the witnesses' testimony and wanted to know if Shaygan wanted to recall the two witnesses. The district court added that, even if the witnesses were recalled, "it's not the end of the story. . . . I would have to go through the evidentiary hearing and determine what else I want to do at the end of the day here." Shaygan took the position that, absent dismissal, mistrial, or striking the testimony, recall of Vento and Clendening would be required.

When Vento and Clendening were recalled, the district court instructed the jury that the recalling of the witnesses was attributable to prosecutorial misconduct in discovery:

> I am now going to reopen the defense cross-examination of two prior witnesses. These are witnesses you have heard from, Carlos Vento and Trinity Clendening. And the reason is that the United States has failed to provide timely to the defense certain information and discovery materials which could have been used by the defense during its cross-examination of each of these witnesses.
> This occurred through no fault of the defense. Now, during the cross-examination that you are going to hear, I expect that you will hear reference to the substance of recorded conversations of defense counsel or members of the defense team by these two witnesses.
> I have personally reviewed the substance of the recorded conversations, and I can assure you that the defense did nothing wrong. Because I concluded that the United States has acted improperly in not turning over the necessary discovery materials and

19

also by allowing recordings to occur in the first place, I am reopening the witnesses' examination so you can hear everything that occurred. Other than that, I [have] no further comment on the evidence.

Shaygan took advantage of the opportunity to focus the attention of the jury on the alleged misconduct by the government in the collateral investigation. During the new cross-examinations of Vento and Clendening, Shaygan accused them of not telling the whole truth to the jury because they had not revealed that they had been asked to record conversations with the defense team. In closing argument, Shaygan compared the alleged misconduct by the government to the Salem witch trials. Shaygan reminded the jury that the district court had instructed them that the "United States [had] acted improperly," and argued that the jurors had been misled by the government. Shaygan argued that innocent women had been convicted and hung in the Salem witch trials "because there were no jurors," and Shaygan urged the jury to say "no" and to "make sure the Salem, Massachusetts[,] witch trials never happen again."

The jury returned a verdict of not guilty on all counts. Immediately after the jury was dismissed, the district court ordered the government to appear on the following Monday "to address the motions that have been filed." The court stated that it would "hear alternative requests for sanctions," including whether a sanction in the form of attorney's fees and costs should be awarded under the Hyde

20

Amendment.

*B. The Sanctions Proceeding*

One day before the inquiry on sanctions, Shaygan moved for an award of attorney's fees and costs under the Hyde Amendment. The district court required the presence of seven witnesses: Tucker, Agent Wells, Agent Brown, Gilbert, Cronin, Hoffman, and defense investigator Graff. All of the witnesses testified except Hoffman. The district court allowed witnesses in the court room only during their own testimony. At the end of the proceeding, the court stated that it had "heard sufficiently" and did not need to hear from Hoffman.

During the proceeding, the government admitted that mistakes had been made in the witness-tampering investigation and in the failure to provide discovery materials to the defense, but the government denied that its legal position had been vexatious or in bad faith. Shaygan conceded that the initiation of the prosecution and the original indictment were not in bad faith, but argued that the prosecution later "became frivolous and in bad faith." Shaygan pointed to the filing of the "superseding Indictment with a hundred extra counts," the investigation of members of the defense team, and discovery violations. Shaygan conceded that "[a]t the end of the day going after the defense lawyers may not be enough under the Hyde Amendment," but then argued that the prosecution was vexatious,

21

frivolous, and in bad faith because of discovery violations. Shaygan argued that, under the Hyde Amendment, "[d]iscovery [abuse alone is enough] . . . to find bad faith and find a prosecution being frivolous."

The government opposed Shaygan's contention that the superseding indictment was used as "an instrument of vengeance" and argued that "the record . . . shows that there were legitimate, evidence-based, reviewed, approved, and well-founded strategic reasons to supersede the Indictment to add all those additional patients to secure the admission of what the Government believed to be relevant evidence and to help strengthen the case." The government argued that the superseding indictment had been filed in good faith:

> There's no improper purpose whatsoever to continuing an investigation when new evidence has been obtained and when time is available to review that and move forward on that and determine if a case should be expanded on, and that was a completely legitimate, evidence-based purpose to go ahead with the superseding Indictment.

Cronin testified that he had decided to supersede the indictment because the government had been "able to find so many additional witnesses."

At the end of the proceeding, Shaygan stated that he was not requesting that the court "exercise any inherent powers of contempt as relating to anyone in the United States Attorney's Office," but would "defer to the Court on that." After hearing all testimony of witnesses, except Hoffman, and oral argument on whether

22

a sanction under the Hyde Amendment was appropriate, the court allowed additional papers to be filed. The court at no time stated that it was considering sanctions against the individual prosecutors.

The government filed a brief after the proceeding in which it "acknowledge[d] and deeply regret[ted] that it made serious mistakes in a collateral investigation that was an offshoot of this case." The government agreed to pay "reasonable attorneys' fees and costs associated with Shaygan's motion to dismiss and for sanctions and the related proceedings." But the government argued that "payment of the fees and costs associated with the entire prosecution is not warranted under the Hyde Amendment because the underlying criminal prosecution, as a whole, was not vexatious, frivolous, or pursued in bad faith." The government nonetheless "believe[d] that the United States should take responsibility for commencing the witness tampering investigation . . . and failing to make the required disclosures," and agreed to pay Shaygan's attorney's fees and costs associated with litigating the motions to dismiss and for sanctions.

The district court granted Shaygan's motion under the Hyde Amendment and ordered the United States to reimburse Shaygan in the amount of $601,795.88 for attorney's fees and costs from the date of the superseding indictment. The district court issued a lengthy written order in which it recounted facts about the

23

prosecution and witness tampering investigation, but virtually ignored the substantial evidence that supported the charges against Shaygan. The district court agreed with the government that the original indictment had been filed in good faith, but concluded that "AUSA Cronin, with the assistance of AUSA Hoffman, along with DEA Special Agent Christopher Wells, acted vexatiously and in bad faith in prosecuting Dr. Shaygan for events occurring after the original indictment was filed and by knowingly and willfully disobeying the orders of this Court." The district court found that the superseding indictment was filed in bad faith because it was "the first manifestation of the 'seismic shift'" and because "[t]he patients that were included in the Superseding Indictment were known to the Government long before the motion to suppress was litigated, yet no Superseding Indictment was sought at an earlier time." The district court found further incidents of bad faith in the witness tampering investigation and discovery violations.

The district court reasoned that the Hyde Amendment allows an award of fees and costs for misconduct that occurred after the filing in good faith of the original indictment. The district court quoted the high standard for an award of attorney's fees and costs under the Hyde Amendment, as explained by this Court in Gilbert: "A defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct—a prosecution brought

vexatiously, in bad faith, or so utterly without foundation in law or fact as to be frivolous." 198 F.3d at 1299. The district court then relied on the decision of the Supreme Court in Hall v. Cole, 412 U.S. 1, 93 S. Ct. 1943 (1973), for the proposition that "[t]he Hyde Amendment is applicable to conduct by the government during the course of a prosecution taken in bad faith even if the commencement of the prosecution was commenced legitimately." The district court also relied on the decisions of the district courts in United States v. Ranger Electronic Communications, Inc., 22 F. Supp. 2d 667 (W.D. Mich. 1998), rev'd on other grounds, 210 F.3d 627 (6th Cir. 2000), and United States v. Troisi, 13 F. Supp. 2d 595 (N.D. W.Va. 1998), and reasoned that "discovery violations in the course of a prosecution can form a basis for the award of attorney's fees under the Hyde Amendment."

The district court entered additional sanctions against the prosecutors. The district court entered a public reprimand "against the United States Attorney's Office and specifically against AUSA Karen Gilbert, Sean Cronin, and Andrea Hoffman." The district court ordered the United States Attorney's Office to provide "the contact information for the relevant disciplinary body of the Bar(s) of which AUSA Cronin and Hoffman are members," and stated that it would request that disciplinary action be taken against Cronin and Hoffman. The district court

25

enjoined the United States Attorney's Office from "engaging in future witness tampering investigation[s] of defense lawyers and team members in any ongoing prosecution before [the court] without first bringing such matters to [its] attention in an <u>ex parte</u> proceeding." The court further stated that it "reserve[d] to impose any further sanctions and/or disciplinary measures as may be necessary against AUSA Cronin and Hoffman after reviewing the results of [a] Justice Department[] investigation."

## II. STANDARD OF REVIEW

Two standards of review govern this appeal. First, we review an award of attorney's fees and costs under the Hyde Amendment for abuse of discretion. <u>United States v. Aisenberg</u>, 358 F.3d 1327, 1338 (11th Cir. 2004). "An abuse of discretion occurs if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award [or a denial] upon findings of fact that are clearly erroneous." <u>Gilbert</u>, 198 F.3d at 1298 (alteration in original) (quoting <u>In re Hillsborough Holdings Corp.</u>, 127 F.3d 1398, 1401 (11th Cir. 1997) (citation and internal quotation marks omitted)). Second, "[w]e review <u>de novo</u> the argument that the sanctions imposed by the district court violated due process." <u>Serra Chevrolet, Inc. v. Gen. Motors Corp.</u>, 446 F.3d 1137, 1147 (11th Cir. 2006).

## III. DISCUSSION

We discuss the merits of this appeal in two parts. First, we explain how the district court abused its discretion when it awarded attorney's fees and costs against the United States under the Hyde Amendment. Second, we explain how the district court violated the rights of Cronin and Hoffman to due process, but why we decline to reassign this case to a different district judge at this stage.

*A. The District Court Applied an Incorrect Legal Standard When It Awarded Attorney's Fees and Costs against the United States under the Hyde Amendment.*

The government makes two arguments that the district court abused its discretion when it awarded attorney's fees and costs against the United States under the Hyde Amendment. First, the government argues that the district court clearly erred when it found that the superseding indictment was "significantly motivated by ill-will." Second, the government argues that the district court committed a legal error because the litigating position of the United States was not "vexatious[], in bad faith, or so utterly without foundation in law or fact as to be frivolous." Gilbert, 198 F.3d at 1299.

We need not decide whether the finding that the filing of the superseding indictment was motivated by subjective ill-will is clearly erroneous. The district court found the superseding indictment was motivated by Cronin's ill-will because "[t]he patients [who] were included in the Superseding Indictment were known to

27

the Government long before the motion to suppress was litigated, yet no Superseding Indictment was sought at an earlier time." The government contends that some of the patients who were included in the superseding indictment were not known to the government until after the motion to suppress had been filed and soon before the hearing on that motion. The government also argues that the finding that the filing of the superseding indictment was motivated by ill-will is clearly erroneous because Cronin's superiors in the United States Attorney's Office reviewed and approved the superseding indictment before it was presented to the grand jury; the final decision rested with others. We need not decide these issues because, even if we assume that the filing of the superseding indictment was subjectively motivated by ill-will, that finding alone cannot support a sanction against the United States under the Hyde Amendment.

We agree with the government that the district court failed to understand the narrow scope of the Hyde Amendment. Congress enacted the Hyde Amendment as part of the Appropriations Act of 1998, and it provides a high standard for an award of attorney's fees and costs against the United States in a criminal case:

> [T]he court, in any criminal case (other than a case in which the defendant is represented by assigned counsel paid for by the public) . . . may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, or in bad faith, unless the court finds that special

28

circumstances make such an award unjust. Such awards shall be granted pursuant to the procedures and limitations (but not the burden of proof) provided for an award under [the Equal Access to Justice Act].

Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and statutory notes).  The initial proposed version of the Hyde Amendment would have allowed a prevailing defendant to recover attorney's fees and costs unless the government could establish that its position was "substantially justified"—modeled after the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)—but that version was criticized on the ground that it made recovery for a prevailing defendant too easy.  See Gilbert, 198 F.3d 1299–1303 (explaining the legislative history of the Hyde Amendment).

"[I]n response to concern that the initial version of the Hyde Amendment swept too broadly, the scope of the provision was curtailed significantly" by Congress in two ways.  Id. at 1302.  First, instead of the "substantially justified" standard from the Equal Access to Justice Act, the Hyde Amendment imposed a standard more favorable to the government: a prosecution must be "vexatious, frivolous, or in bad faith."  Second, unlike the Equal Access to Justice Act, the Hyde Amendment placed the burden of satisfying that standard on the defendant, not on the government.

We explained in Gilbert the "daunting obstacle," id. at 1302, a defendant

29

must overcome—at a minimum, satisfying an objective standard that the legal position of the United States amounts to prosecutorial misconduct—for an award of attorney's fees and costs under the Hyde Amendment:

> From the plain meaning of the language Congress used, it is obvious that a lot more is required under the Hyde Amendment than a showing that the defendant prevailed at the pre-trial, trial, or appellate stages of the prosecution. A defendant must show that the government's position underlying the prosecution amounts to prosecutorial misconduct—a prosecution brought vexatiously, in bad faith, or so utterly without foundation in law or fact as to be frivolous.

Id. at 1299. Gilbert established that our inquiry under the Hyde Amendment is whether the prosecution of Shaygan for illegally dispensing controlled substances amounted to misconduct.

Because the words "vexatious, frivolous, or in bad faith," are not defined in the Hyde Amendment, we defined them in Gilbert according to their ordinary meaning. Id. at 1298–99. "'Vexatious' means 'without reasonable or probable cause or excuse.'" Id. (quoting Black's Law Dictionary 1559 (7th ed. 1999)). "A 'frivolous action' is one that is '[g]roundless . . . with little prospect of success; often brought to embarrass or annoy the defendant.'" Id. at 1299 (alterations in original) (quoting Black's Law Dictionary 668 (6th ed. 1990)). "'[B]ad faith' 'is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; . . . it contemplates a

30

state of mind affirmatively operating with furtive design or ill will.'" Id. (second alteration in original) (quoting Black's Law Dictionary 139 (6th ed. 1990)).

The district court erroneously concluded that the superseding indictment was filed in bad faith under the Hyde Amendment. The district court found that it was "Cronin's displeasure and ill-will toward defense counsel as a result of Defendant's Motion to Suppress, as evidenced by his 'seismic shift' comment[] [that] led to the filing of a Superseding Indictment," but the record establishes that, regardless of Cronin's displeasure or subjective ill-will, the government had an objectively reasonable basis for superseding the indictment.

We do not measure bad faith or vexatiousness only by whether a prosecutor expressed displeasure with defense counsel. "Bad faith is an objective standard that is satisfied when an attorney knowingly or recklessly pursues a frivolous claim." Peer v. Lewis, 606 F.3d 1306, 1314 (11th Cir. 2010); see also United States v. Knott, 256 F.3d 20, 29 (1st Cir. 2001) ("[A] determination that a prosecution was 'vexatious' for the purposes of the Hyde Amendment requires . . . a showing that the criminal case was objectively deficient, in that it lacked either legal merit or factual foundation[] . . . ."); United States v. Sherburne, 249 F.3d 1121, 1126–27 (9th Cir. 2001) ("We conclude that for purposes of the Hyde Amendment, the term 'vexatious' includes both of these characteristics: subjective

31

and objective.") (footnote omitted). "[A] prosecutor's discretion is [also] 'subject to constitutional constraints.'" United States v. Armstrong, 517 U.S. 456, 464, 116 S. Ct. 1480, 1486 (1996) (quoting United States v. Batchelder, 442 U.S. 114, 125, 99 S. Ct. 2198, 2204–05 (1979)). "[T]he decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" Id. (quoting Oyler v. Boles, 368 U.S. 448, 456, 82 S. Ct. 501, 506 (1962)). But a finding of bad faith under the Hyde Amendment cannot rest on evidence of displeasure or subjective ill-will alone.

In the light of the evidence that supported the superseding indictment, the charges against Shaygan were not objectively filed in bad faith; the government did not "knowingly or recklessly pursue a frivolous claim," Peer, 606 F.3d at 1314, or exceed any constitutional constraint, see Armstrong, 517 U.S. at 464, 116 S. Ct. at 1486. The government interviewed additional patients of Shaygan after his arrest, and those patients gave incriminating information about Shaygan, including that he had dispensed controlled substances without performing physical examinations. The government also used evidence from Shaygan's medical files and day planner to build its case. All of the patients who were added by the superseding indictment testified as witnesses for the government at trial. Even if the testimony of Tucker and McQuarrie contradicted the DEA-6 reports prepared after their initial

32

interviews, "[f]or Hyde Amendment purposes[] . . . the court must assess the basis for pursuing charges from the perspective of the government at the time." Knott, 256 F.3d at 35.

We define bad faith for purposes of the Hyde Amendment as "'the conscious doing of a wrong,'" Gilbert, 198 F.3d at 1299 (quoting Black's Law Dictionary 139 (6th ed. 1999)), and superseding an indictment with the support of newly discovered evidence does not meet that standard. Newly obtained evidence is unquestionably a good faith reason to supersede an indictment. See United States v. Bryant, 770 F.2d 1283, 1287 (5th Cir. 1985) ("[N]ewly discovered evidence[] [that] indicat[ed] that the extent of [a defendant's] misconduct was much greater than had been known at the time the original indictment was filed[] justifiably motivated the prosecutorial decision to obtain additional counts."). The filing of a superseding indictment supported by newly discovered evidence is not prosecutorial misconduct.

A comparison with the Equal Access to Justice Act confirms that Congress created an objective standard of bad faith to govern an award of attorney's fees and costs under the Hyde Amendment. Under the Equal Access to Justice Act, which provides for an award of attorney's fees and costs against the United States for a prevailing party in a civil action, the government can avoid an award by

establishing that its legal position was "substantially justified." 28 U.S.C. § 2412(d)(1)(A). If a finding of subjective ill-will alone were sufficient to sustain an award of fees under the Hyde Amendment, then it would be more difficult to obtain an award of fees under the Equal Access to Justice Act than under the Hyde Amendment: a prosecution might be "substantially justified" within the meaning of the Equal Access to Justice Act because it is supported by substantial evidence, but punishable by sanctions under the Hyde Amendment if the prosecutor harbored ill-will. Congress intended the opposite: that is, to make an award of attorney's fees and costs under the Hyde Amendment more, not less, difficult to obtain than under the Equal Access to Justice Act. See Gilbert, 198 F.3d at 1302. In other words, if Shaygan "failed even to establish that the government's prosecution . . . was not substantially justified, [he] cannot establish that the prosecution was vexatious, frivolous, or in bad faith." United States v. Truesdale, 211 F.3d 898, 910 (5th Cir. 2000).

Bad faith is also measured objectively in other instances of litigation misconduct that, unlike the Hyde Amendment, do not implicate sovereign immunity. A federal court, for example, can sanction a private attorney for "unreasonably and vexatiously" multiplying a proceeding, 28 U.S.C. § 1927, "only when the attorney's conduct is so egregious that it is 'tantamount to bad faith,'"

Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1239 (11th Cir. 2007) (quoting Avirgan v. Hull, 932 F.2d 1572, 1582 (11th Cir. 1991)), and "bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct," id.; see also Norelus v. Denny's, Inc., 628 F.3d 1270, 1282 (11th Cir. 2010) ("The standard is an objective one . . . ."). In a recent decision, where we reviewed the denial of sanctions under Federal Rule of Civil Procedure 11, section 1927, and the inherent power of a district court, we reaffirmed that "[b]ad faith is an objective standard that is satisfied when an attorney knowingly or recklessly pursues a frivolous claim." Peer, 606 F.3d at 1314. If a determination of bad faith is governed by an objective standard when sanctions are imposed on private attorneys and litigants, bad faith cannot be established by a lesser showing when sanctions are imposed against the United States. After all, "the established principle that waivers of sovereign immunity are to be construed narrowly counsels our construction of the Hyde Amendment." Aisenberg, 358 F.3d at 1341.

Respect for the separation of powers also informs our understanding that the Hyde Amendment provides an objective standard for bad faith. "In our criminal justice system, the Government retains 'broad discretion' as to whom to prosecute." Wayte v. United States, 470 U.S. 598, 607, 105 S. Ct. 1524, 1530 (1985) (quoting United States v. Goodwin, 457 U.S. 368, 380 n.11, 102 S. Ct.

35

2485, 2492 n.11 (1982)).  The Attorney General and United States Attorneys "have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'"  Armstrong, 517 U.S. at 464, 116 S. Ct. at 1486 (quoting U.S. Const. art. II, § 3).  "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review."  Wayte, 470 U.S. at 607, 105 S. Ct. at 1530.  "It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function."  Armstrong, 517 U.S. at 465, 116 S. Ct. at 1486.  In the light of this constitutional framework, we cannot read the Hyde Amendment to license judicial second-guessing of prosecutions that are objectively reasonable.

Our review of the good or bad faith of a prosecution under the Hyde Amendment is akin to our review of qualified immunity, which shields official acts that are objectively reasonable.  "Qualified immunity is a real-world doctrine designed to allow [public] officials to act (without always erring on the side of caution) when action is required to discharge the duties of public office."  Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996).  In that context, "[o]bjective legal reasonableness is the touchstone."  Lassiter v. Ala. A & M Univ., Bd. of Trs., 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc); see also Hope v. Pelzer, 536 U.S. 730,

36

747, 122 S. Ct. 2508, 2519 (2002) ("applying the objective immunity test of what a reasonable officer would understand").  For that reason, we will grant qualified immunity from civil liability for an official whose conduct is objectively reasonable "even when motivated by a dislike or hostility to certain protected behavior by a citizen."  Foy, 94 F.3d at 1534.  And we do so for a sound reason: "When public officials do their jobs, it is a good thing."  Id.  In the same way, we cannot interpret the Hyde Amendment to thwart the objectively reasonable performance of prosecutorial duties.

Shaygan did not even argue that the charges in the superseding indictment were frivolous or exceeded any constitutional constraint.  Shaygan relied instead primarily on Cronin's "seismic shift" comment to establish that the superseding indictment was filed in subjective bad faith, but tough negotiating tactics and harsh words used by prosecutors cannot alone be grounds for a determination of bad faith under the Hyde Amendment.

A rule that would allow a determination of bad faith whenever a prosecutor uses harsh words, such as "seismic shift," and harbors some ill-will toward the defense would "chill the ardor of prosecutors and prevent them from prosecuting with earnestness and vigor.  The Hyde Amendment was not intended to do that." Gilbert, 198 F.3d at 1303.  In United States v. Schneider, for example, the Second

Circuit held that an "alleged vow to indict [a defendant] if he invoked the Fifth Amendment . . . without more," could not support an award of attorney's fees under the Hyde Amendment. 395 F.3d 78, 88 (2d Cir. 2005). The same result is required here, where the prosecution filed a superseding indictment supported by newly-discovered evidence, even if that filing was prompted by Shaygan's allegations in support of his motion to suppress. The Supreme Court has explained that, in all but an exceptional case, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct. 663, 668 (1978).

This appeal is unlike United States v. Adkinson, 247 F.3d 1289 (11th Cir. 2001), where we affirmed an award under the Hyde Amendment because the litigating position of the government was vexatious, frivolous, and in bad faith, id. at 1293. In Adkinson, the government, "'[w]ith full knowledge that it was contrary to recent and controlling precedent, . . . induced the grand jury' to charge" the defendant with a crime that did not exist. Id. at 1292 (alterations in original) (quoting United States v. Adkinson, 135 F.3d 1363, 1374 (11th Cir. 1998)). We held that "[p]rosecuting [defendants] in defiance of controlling authority

38

constitutes 'vexatious,' 'frivolous,' and 'bad faith' prosecutions." Id. at 1293. In this appeal, no one contends that Shaygan was charged with conduct that did not constitute a crime. Dispensing controlled substances outside the scope of professional practice is a crime, 21 U.S.C. § 841(a)(1), and Shaygan would have been legitimately convicted if the jury had believed the witnesses for the government. See Schneider, 395 F.3d at 85 ("The case was not vexatious because the government had more than adequate evidence to establish each element of the crimes and the jury's credibility determinations did not undermine the legal merit or factual foundation of the prosecution.").

The district court also erroneously concluded that discovery violations alone can support an award of attorney's fees and costs under the Hyde Amendment. The Hyde Amendment allows an award of attorney's fees and costs against the United States only when its overall litigating position was vexatious, frivolous, or in bad faith. The district court erroneously relied on the decision of the Supreme Court in Hall, 412 U.S. 1, 93 S. Ct. 1943, to conclude that "[t]he Hyde Amendment is applicable to conduct by the government during the course of a prosecution taken in bad faith even if the commencement of the prosecution was commenced legitimately." The Supreme Court in Hall did not address the Hyde Amendment, but observed the general principle "that 'bad faith' may be found, not only in the

39

actions that led to the lawsuit, but also in the conduct of the litigation." Id. at 15, 93 S. Ct. at 1951. Hall involved fee-shifting between two private litigants under the inherent equitable power of the court. The Hyde Amendment establishes a more stringent standard and applies only to "a prosecution brought vexatiously, [frivolously, or] in bad faith." Gilbert, 198 F.3d at 1299; see also Schneider, 395 F.3d at 90 (quoting Pub. L. No. 105-119, § 617, 111 Stat. 2440, 2519) ("We note that the statute does not allow an award for any instance of vexatious, frivolous, or bad-faith conduct. An award is allowed only where the court finds that 'the position of the United States was vexatious, frivolous, or in bad faith.'"). Moreover, Hall did not involve a waiver of sovereign immunity, but "the established principle that waivers of sovereign immunity are to be construed narrowly counsels our construction of the Hyde Amendment." Aisenberg, 358 F.3d at 1341.

The district court also erroneously relied on Troisi, 13 F. Supp. 2d 595, and Ranger, 22 F. Supp. 2d 667, for the proposition that "courts have held that discovery violations in the course of a prosecution can form a basis for the award of attorney's fees under the Hyde Amendment." Troisi is inapposite; the district court denied the defendant's motion under the Hyde Amendment because "the position of the United States in prosecuting Troisi was reasonable and did not rise

40

to the level of vexatious, frivolous, or bad faith litigation." Troisi, 13 F. Supp. 2d at 597. Although the district court in Ranger awarded sanctions under the Hyde Amendment based only on discovery violations, that decision is unpersuasive. The district court in Ranger failed to discuss the meaning of "position of the United States" for purposes of the Hyde Amendment, and the Sixth Circuit later reversed its decision on alternative grounds, see United States v. Ranger Elec. Commc'ns, Inc., 210 F.3d 627 (6th Cir. 2000). Contrary to Ranger, the Sixth Circuit later interpreted the term "position" in the Hyde Amendment to address a broader issue. In United States v. Heavrin, 330 F.3d 723, 725 (6th Cir. 2003), the district court had awarded a defendant attorney's fees and costs under the Hyde Amendment on the ground that some of the charges against him were frivolous, but the Sixth Circuit reversed. The Sixth Circuit ruled that the district court erred when it awarded attorney's fees and costs without "assess[ing] the case as an inclusive whole." Id. at 731. The Sixth Circuit reasoned that "[a] count-by-count analysis" was inconsistent with the Hyde Amendment because its plain language refers to the "position" of the United States in the singular. Id. at 730. It concluded that, "[w]hen assessing whether the position of the United States was vexatious, frivolous, or in bad faith, the district court should . . . make only one finding, which should be based on the case as an inclusive whole." Id. (internal quotation

41

marks omitted).

We reject the dissent's reading of the text of the Hyde Amendment. The dissent argues that we have "take[n] the word 'or' out of the statute by reading 'in bad faith' as meaning the same thing as either 'vexatious' or 'frivolous,'" Dissenting Op. at 51, but the dissent misreads our holding. Subjective ill-will is relevant, but not sufficient for a finding of bad faith. We have explained that a prosecution brought in bad faith is one where wrongful motives are joined to a prosecution that is either baseless or exceeds constitutional restraints; a bad faith prosecution is not necessarily vexatious or frivolous. The dissent also contends that "[t]he word 'position,' as used in the Hyde Amendment, can easily apply to the way in which the Government conducts the prosecution, including the ill-will state of mind that a prosecutor's acts evidence," Dissenting Op. at 56, n.8, but the "position" must be that "of the United States." We read that phrase–"position of the United States"–to refer to the legal position of the government, not the mental attitude of its prosecutor.

The dissent ignores our precedents that establish that bad faith is measured objectively and instead would create a double standard. The dissent does not deny that the prosecution of Shaygan was objectively reasonable, but instead argues that district courts have discretion to award attorney's fees against the United States

42

under the Hyde Amendment if a prosecutor is "driven along by things like personal ambition, personal vindictiveness, or politics," Dissenting Op. at 52. The dissent fails to explain why an award of attorney's fees against the government, which implicates both the separation of powers and sovereign immunity, can be based on only subjective ill-will, but an award of attorney's fees against a private litigant must satisfy a more demanding objective standard, see 28 U.S.C. § 1927. See also Amlong, 500 F.3d at 1239; Norelus, 628 F.3d at 1282; Peer, 606 F.3d at 1314. This double standard also would create, contrary to the intent of Congress, a more lenient standard for an award of fees under the Hyde Amendment than the standard created by the Equal Access to Justice Act, see 28 U.S.C. § 2412(d)(1)(A). See also Truesdale, 211 F.3d at 910.

The dissent asserts that "the only serious inquiry in this case is when the liability for fees and expenses should start," Dissenting Op. at 57, because the government earlier offered to pay some fees, but the government never waived its argument that the Hyde Amendment does not support an award of attorney's fees and costs for Shaygan. The government argues on appeal that the Hyde Amendment does not apply, and Shaygan does not even suggest that the government ever waived that argument. Although the government offered to pay some of Shaygan's attorney's fees related to the collateral investigation, Shaygan

43

never accepted the offer, which came before the district court entered its judgment. The earlier offer by the government to pay some of Shaygan's fees voluntarily is entirely different from an order of the district court requiring that those fees and more be paid by the government under the Hyde Amendment.

The district court had no discretion to award Shaygan attorney's fees and costs. When it considers a motion under the Hyde Amendment, a district court has every right to consider evidence of subjective ill-will, but that evidence is not dispositive. See Amlong, 500 F.3d at 1241 ("Although the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the calculus . . . ."). The starting point for a potential award of attorney's fees and costs under the Hyde Amendment is an objectively wrongful prosecution: that is, a prosecution that either is baseless or exceeds constitutional constraints. If the prosecution is objectively reasonable, as was the case here, then a district court has no discretion to award a prevailing defendant attorney's fees and costs under the Hyde Amendment.

*B. The District Court Deprived Cronin and Hoffman of Their Right to Due Process, but We Decline to Reassign this Case at this Stage.*

The district court violated the civil rights of the two lead prosecutors, Cronin and Hoffman, when it publically reprimanded them without first affording them due process. We have been clear that "for the imposition of sanctions to be proper,

a court 'must comply with the mandates of due process.'" Thomas v. Tenneco

Packaging, Co., 293 F.3d 1306, 1320 (11th Cir. 2002) (quoting Chambers v.

NASCO, Inc., 501 U.S. 32, 50, 111 S. Ct. 2123, 2136 (1991)). "Due process

requires that the attorney (or party) be given fair notice that his conduct may

warrant sanctions and the reasons why." In re Mroz, 65 F.3d 1567, 1575 (11th Cir.

1995). "Notice can come from the party seeking sanctions, from the court, or from

both. In addition, the accused must be given an opportunity to respond, orally or in

writing, to the invocation of such sanctions and to justify his actions." Id. at

1575–76 (citation omitted).

The district court did not provide Cronin or Hoffman with notice that it was

considering a public reprimand. At the sanctions proceeding, the court specifically

asked Shaygan, "You're not requesting that I exercise any inherent powers of

contempt as relating to anyone in the United States Attorney's Office[?]" Shaygan

responded, "No, Your Honor. I would defer to the Court on that. I don't think I

have a dog in that fight. . . . Any other relief, I think, is better addressed between

Your Honor and the U.S. Attorney's Office." Cronin and Hoffman were not even

aware of this exchange because the court had sua sponte sequestered them as

witnesses.

The district court conducted an inquiry, not an adversarial hearing, and both

prosecutors were denied a meaningful opportunity to be heard in that proceeding. Cronin testified at the sanctions proceeding, but he was not represented by an attorney, had no opportunity to cross-examine any witnesses, and did not know that the district court might rely on his testimony to impose an individual sanction. Cronin's testimony at the sanctions proceeding did not constitute an opportunity to be heard in the Anglo-American tradition. As the Supreme Court explained long ago, "The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused. He can then be given no opportunity to expunge the earlier statements and start afresh." In re Ruffalo, 390 U.S. 544, 550, 88 S. Ct. 1222, 1226 (1968); see also Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1211 (11th Cir. 1985). The denial of Hoffman's right to due process was even more egregious. Hoffman was never even called as a witness, and because of the sequestration order there was no way for Hoffman to know about the testimony of the other witnesses at the proceeding.

Cronin and Hoffman also request that we reassign this case to a different district judge, but we decline to do so. "Reassignment is an extraordinary order, and we 'do not order [it] lightly.'" United States v. Gupta, 572 F.3d 878, 891 (11th Cir. 2009) (alteration in original) (quoting United States v. Torkington, 874 F.2d

46

1441, 1447 (11th Cir. 1989)). Absent evidence of actual bias, we consider three elements: "(1) whether the original judge would have difficulty putting his previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." Torkington, 874 F.2d at 1447. We expect the district judge to put his previous views and findings aside, although that expectation might be unreasonable in a second, see United States v. Martin, 455 F.3d 1227, 1242 (11th Cir. 2006), or third, see Gupta, 572 F.3d at 880, appeal. At this stage, reassignment is unnecessary to preserve the appearance of justice and would require undue duplication of effort.

We express no view about whether the district court should conduct further proceedings, but if the district court decides again to consider sanctions against Cronin or Hoffman, it must, of course, afford them due process. An attorney charged with misconduct is entitled to notice of the charge: that is, the attorney is entitled to know the precise rule, standard, or law that he or she is alleged to have violated and how he or she allegedly violated it. Each of these attorneys also cannot be held responsible for the acts or omissions of others: Cronin, for example, cannot be held responsible for the acts or omissions of his superiors, such as Gilbert, and Hoffman cannot be held responsible for Cronin's acts or omissions.

47

Another reprimand also would be subject to another appeal to this Court.

We do not mean to suggest or even hint that the district court should consider sanctions against either Cronin or Hoffman. It is not apparent to us that either attorney necessarily violated any ethical rule or any constitutional or statutory standard. The record before us is unreliable because it was developed, after all, without affording either of them due process.

## IV. CONCLUSION

The award of attorney's fees and costs against the United States is **VACATED**. The public reprimands of Cronin and Hoffman are **VACATED**, and this matter is **REMANDED**.

EDMONDSON, Circuit Judge, dissenting in part and concurring in the result in part:

This appeal presents a question of statutory construction: what is the significance of the words "or in bad faith" in the Hyde Amendment? I dissent and write separately because I believe that the phrase "or in bad faith" covers, and was intended to cover, prosecutorial positions beyond those positions that are baseless or exceed constitutional constraints: the limit that today's Court imposes. I would affirm the District Court's decision to award, per the Hyde Amendment, fees and expenses.

The Hyde Amendment provides that a court presiding over a criminal case "may award to a prevailing party, other than the United States, a reasonable attorney's fee and other litigation expenses, where the court finds that the position of the United States was vexatious, frivolous, <u>or in bad faith</u>, unless the court finds that special circumstances make such an award unjust."[1] Pub. L. No. 105-119, §

---

[1] The Hyde Amendment words that set out the standard for the award of fees and expenses differ significantly from the words for the standard set out in the Equal Access to Justice Act ("EAJA"), which allows for awarding fees from the Government to prevailing parties in civil actions. 28 U.S.C. § 2412(d)(1)(A). And although the Hyde Amendment does incorporate some procedures from the EAJA, the Hyde Amendment -- for the award standard -- does not reference or incorporate the EAJA standard for an award. I believe that, given that the EAJA was referenced for some purposes but not for the award standard, the Hyde Amendment

617, 111 Stat. 2440, 2519 (1997) (reprinted in 18 U.S.C. § 3006A, historical and

statutory notes) (emphasis added).  And we have said that a position taken in bad

faith reflects "not simply bad judgment or negligence, but rather it . . .

contemplates a state of mind affirmatively operating with furtive design or ill will."

United States v. Gilbert, 198 F.3d 1293, 1299 (11th Cir. 1999) (internal quotation

mark omitted) (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)).

I understand this "state of mind" element to mean that the "in bad faith"

standard is essentially a question of fact[2] about the federal prosecutor's subjective

intent as he drove a prosecution forward.  From the statute's text itself, I also

understand the word "or" in the phrase "or in bad faith" to mean that "in bad faith"

is a complete alternative basis to support an award of attorney's fees and other

---

standard for an award was intended to be understood independently from the EAJA standard and to be understood on the Hyde Amendment's own terms.  Because the loss of a person's freedom is involved, the Executive Branch's powers as prosecutor are greater, more uniquely governmental, and more to be feared by the People than the Executive Branch's power as a civil litigant; thus, it makes sense to me that Congress chose one standard for civil cases and another standard for criminal cases -- and that the standard for criminal cases would stress deterring venomous prosecutorial conduct.

[2] We have stated in various contexts that intent is ordinarily a question of fact.  See, e.g., Rutherford v. Crosby, 385 F.3d 1300, 1307 (11th Cir. 2004) (in double-jeopardy case, "[t]he prosecutor's intent is a question of fact") (citation omitted); Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1476 (11th Cir. 1991) (stating, in trademark-infringement case, that "[a]s a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial") (citations omitted); Aronowitz v. Health-Chem Corp., 513 F.3d 1229, 1237 (11th Cir. 2008) (contract case); Williams v. Obstfeld, 314 F.3d 1270, 1277 (11th Cir. 2002) (RICO case).

50

litigation expenses.  So, it is unimportant that a prosecution was not "vexatious"[3]

and was not "frivolous"[4]: put differently, it is not decisive under the statute that a

criminal prosecution was conducted in an objectively reasonable way (not

vexatious) and that the prosecution had an objectively realistic likelihood of

success (not frivolous).  Congress, by adding the phrase "or in bad faith," was

looking beyond litigation positions that were either vexatious or frivolous and

addressing something different.  We must not take the word "or" out of the statute

by reading "in bad faith" as meaning the same thing as either "vexatious" or

"frivolous."

That the Executive Branch's legal position (when viewed objectively) is

debatably correct throughout the course of a prosecution is <u>not</u> always sufficient to

avoid imposition of Hyde sanctions, <u>if</u> (1) the defendant is completely acquitted,

and (2) the judge who tried the case finds that the Government's position, in fact,

was motivated by prosecutorial bad faith. Ill will, the touchstone of bad faith, is not

a sophisticated or technical concept.  I believe that Congress accepted that some

---

[3] A "vexatious" position is one "without reasonable or probable cause or excuse." <u>Gilbert</u>, 198 F.3d at 1298-99 (quoting BLACK'S LAW DICTIONARY 1559 (7th ed. 1999)) (internal quotation marks omitted).

[4] A "frivolous" position is "[g]roundless . . . with little prospect of success; often brought to embarrass or annoy the defendant." <u>Id.</u> at 1299 (alteration in original) (quoting BLACK'S LAW DICTIONARY 668 (6th ed. 1990)) (internal quotation marks omitted).  This definition means, for me, "frivolous" = baseless.  And baseless ≠ "in bad faith."

51

prosecutions, in fact, are driven along by things like personal ambition, personal vindictiveness, or politics; and I believe Congress intended those prosecutorial positions to be included within the "or in bad faith" standard of the Hyde Amendment -- even when the prosecution is pressed in an objectively reasonable way (not vexatious) and has an objectively reasonable likelihood of success (not frivolous).[5]

As Congressman Hyde said in the debates about what -- with modifications -- was to become the Hyde Amendment: "People do get pushed around, and they can get pushed around by their government."  143 Cong. Rec. H7786-04, H7791

---

[5] Congress was not being radically innovative.  The idea that litigation can be conducted in a manner that is both proper in form and, at the same time, wrongful -- because of the bad ulterior motive for which the litigation is used -- is no innovative idea in the law.  For example, the traditional tort of abuse of process is broadly in line with this idea.  And in the specific context of that tort, intent is a question for the fact-finder.  See 1 AM. JUR. 2d Abuse of Process § 24 (2011) ("The existence of an ulterior motive is a question for the jury."); McCollough v. Johnson. Rodenburg & Lauinger, LLC, 637 F.3d 939, 956-57 (9th Cir. 2011) (concluding that there was sufficient evidence for the jury to find an ulterior purpose); Warwick Dev. Co., Inc. v. GV Corp., 469 So.2d 1270, 1275 (Ala. 1985) (stating that "there was sufficient evidence from which the jury could find that defendants initiated" legal proceedings for an improper purpose).

I note that, in the legislative history of the Hyde Amendment, Congressman Skaggs read from what he said was a statement from the Executive Branch in opposition to what would, with modifications, later become the Hyde Amendment: the Executive Branch stated that "[the legislation] would create a monetary incentive for criminal defense attorneys to generate additional litigation in cases in which prosecutors have in good faith brought sound charges. . . ." 143 Cong. Rec. H7786-04, H7792 (Sept. 24, 1997) (statement of Rep. Skaggs).  I point out that the Executive Branch itself wrote about both "in good faith" and "sound charges": that is, two different, independent, and important ideas were touched upon by the Executive Branch.  I believe the resulting Hyde Amendment itself also touches upon different ideas: the idea of different kinds of unsoundness -- frivolous or vexatious -- and the separate idea of bad faith.  I have little doubt that a crafty lawyer can act with improper motives and, at the same time, appear to stay technically within the outside borders of the law (or, at least, the debatable law).  I expect that Congress and the President had little doubt of it either.

(Sept. 24, 1997) (statement of Rep. Hyde). I submit that it is, in part, for these pushing-around cases -- the misuse of the browbeating dominance that can come from holding a prosecutorial office -- for which the phrase "or in bad faith" was enacted into law in what is called the Hyde Amendment.

The District Judge who presided over the trial in this case and who then ordered the award of Hyde sanctions is an experienced judge with -- as far as I know -- no history of hostility to the Department of Justice or to prosecutors.

In applying the Hyde Amendment, the District Court entered a published order crowded with thorough findings of fact. See United States v. Shaygan, 661 F. Supp. 2d 1289 (S.D. Fla. 2009). After a hearing at which he had an opportunity to interrogate the lead prosecutor and the principal criminal investigator as well as other witnesses,[6] the District Judge determined, in fact, that bad faith was widely present in the Government's prosecution of Defendant:

> I conclude that the position taken by Cronin [the lead prosecutor] in filing the superseding indictment; initiating and pursuing the collateral investigation based on unfounded allegations; suppressing information about the roles of two key government witnesses as cooperating witnesses in the collateral investigation; and attempting to

---

[6] At the evidentiary hearing, the District Judge observed the demeanor and heard the testimony of the witnesses central to this case, gaining insight into the witnesses' credibility, apparent sincerity, consistency, and a number of other traits. See, e.g., Owens v. Wainwright, 698 F.2d 1111, 1113 (11th Cir. 1983) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony.") (citations omitted). State of mind is a highly subjective matter in which the demeanor of witnesses is of particular significance.

53

secure evidence from the collateral investigation that would have jeopardized the trial and severely prejudiced the Defendant, constitute bad faith. These were conscious and deliberate wrongs that arose from the prosecutors' moral obliquity and egregious departures from the ethical standards to which prosecutors are held. Id. at 1321.

The District Court's decision to award Defendant attorney's fees and costs dating back to the time of the Superseding Indictment stemmed from the Court's factual determination that the Superseding Indictment was the "first manifestation" of the "seismic shift" with which the lead prosecutor (Cronin) had threatened defense counsel. Id. at 1298. According to the District Court, the decision to add 118 counts was "significantly motivated by ill-will."[7] Id. And the Court specifically rejected the lead prosecutor's blander explanation for his "seismic shift" comment; the District Court found that it was "not possible to square the threat with a good faith prosecution of this case." Id. at 1294.

For me then, this case ultimately turns on whether the record in this case contains sufficient evidence of bad faith -- that is, prosecutorial ill-will -- to make the District Judge's fact-finding of "bad faith" not clearly erroneous. I conclude that the record does contain sufficient evidence and that the District Judge's central

---

[7] One problem with the Superseding Indictment itself is that one of the patient/witnesses who was added in the Superseding Indictment flatly denied, at trial, saying the negative things about Defendant that the Government's chief investigator attributed to this witness before the Superseding Indictment was obtained; and the District Judge credited this witness's denial. Shaygan, 661 F. Supp. 2d at 1296-97.

finding -- that the Government's position in this case was "in bad faith" by the time of the filing of the Superseding Indictment -- is not clearly erroneous.

I conclude that the evidentiary record is sufficient as a whole to support the Hyde Amendment fact-findings of the District Judge, but I make two specific observations. First, the District Judge heard the testimony of the lead prosecutor and rejected the prosecutor's explanation. I am aware that we uphold criminal convictions regularly based upon the sufficiency of evidence that proceeds from a criminal defendant's testifying to his innocence. We say -- I believe entirely correctly -- that a fact-finder is entitled to believe the exact opposite of what a witness testifies to and, then, to treat this disbelieved testimony as substantive evidence of guilt. United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995). I think the same thought process applies here: the prosecutor and the criminal investigator offered explanations for their questionable conduct; the District Judge rejected their explanations and determined that the opposite -- a prosecution hammered into shape "in bad faith" -- was the truth.[8]

---

[8] This determination was not simply a matter of disbelief. The record reflects many irregularities in the Government's handling of this case. For example: the magistrate judge, in recommending that the District Court grant Defendant's motion to suppress, found the testifying DEA agents -- including the principal criminal investigator -- to lack credibility (and the District Court accepted that magistrate judge's recommendation); the Government has admitted to multiple discovery violations; and the Government not only conducted an improper investigation of defense counsel, but kept this investigation from the District Court until the Government's hand was forced by the revealing testimony of one Government witness. Plenty of evidence in the record corroborates the District Court's finding of a prosecutorial position of bad faith and its

Second, the Department of Justice does not contend that this prosecution proceeded entirely properly. In fact, the Department of Justice conceded and offered to pay -- in the United States Attorney's words, "pursuant to the Hyde Amendment" -- some attorney's fees and litigation expenses: those stemming from the secret tape-recording of the defense team.[9]

But the Department does not want to pay fees and expenses dating back to the Superseding Indictment. Given that the Government does not dispute that the

---

finding that the prosecutor and criminal investigator lacked credibility.

By the way, no party to this case contends that the first Indictment in this case was filed in bad faith. I understand the Government not to dispute that, as a matter of law, the manner of advancing a prosecution can make the Government's position in that prosecution a position "in bad faith," even when the initial Indictment was not "in bad faith." But whether the Government does or does not accept this legal proposition, I do. Moreover, the Government, by its very nature, can act only through agents who represent it, such as its Assistant United States Attorneys prosecuting criminal cases. The word "position," as used in the Hyde Amendment, can easily apply to the way in which the Government conducts the prosecution, including the ill-will state of mind that a prosecutor's acts evidence; this definition is not a strained use of the word "position." The Oxford English Dictionary defines "position" as "[m]ental attitude; the way in which one looks upon or views a subject or question." XII OXFORD ENGLISH DICTIONARY 165 (2d ed. 1989). To me, in this sense the word "position" echoes Congress's use of the phrase "in bad faith" in the statute.

[9] A concession by the Government is not critical to my analysis of, or my conclusion in, this appeal. The Government, however, did put into writing to the District Court that the Government "acknowledges and deeply regrets that it made serious mistakes in a collateral investigation that was an offshoot of this case and stands ready to pay the additional attorneys'fees and costs incurred by the defendant as a result." The same Government brief later says to the District Court that "the United States Attorney has decided, on behalf of the government, to waive any legal defenses pursuant to the Hyde Amendment, and thus not contest payment pursuant to the Hyde Amendment, of the defendant's attorneys' fees and costs associated with litigating the motions to dismiss and for sanctions." Considering how the adversarial process played out in the District Court, that some fees and expenses could be awarded to Defendant was not contested when the matter of Hyde Amendment payments was submitted for decision to the District Court.

prosecutor in this case did things that ought not to have been done and that would justify Hyde Amendment fees and expenses at some point, it seems to me that the only serious inquiry in this case is when the liability for fees and expenses should start: a fact question of where to draw the line. Pursuant to Rule 404(b), we routinely allow evidence of other crimes and wrongs to show the bad motive and bad intent that accompanied a criminal defendant's conduct as he did something else. FED. R. EVID. 404(b). Especially applying the rationale of 404(b), it seems to me that the District Court had ample support to think that the filing of the Superseding Indictment was motivated by the same bad faith as the later acts of discovery violations and improper investigation of the defense team.[10] So, the District Court's starting the fees at the time of the Superseding Indictment seems to have a more-than-adequate factual basis.

The Government says that the Superseding Indictment was not significantly

---

[10] I know that Hyde Amendment sanctions are not available where the Government's bad faith is limited to isolated incidents. Accord United States v. Schneider, 395 F.3d 78, 90 (2d Cir. 2005) ("[T]he [Hyde Amendment] does not allow an award for [just] any instance of vexatious, frivolous, or bad-faith conduct."). The statute speaks of "the position of the United States"; and so we will uphold an award under the Hyde Amendment only when the Government's handling of a prosecution is so substantially vexatious, frivolous, or in bad faith as to characterize the Government's overarching position in the case. We ignore trifles. We view a case in which Hyde sanctions have been awarded with a wide lens, looking at the Government's position as a whole. The Superseding Indictment, the inappropriately conducted investigation of defense counsel for the purpose of disqualifying them on the eve of trial, and the disobedience of proper discovery rules and so forth are significant and show a course of dealing; and the District Court was justified in finding that the spiteful manner in which the prosecutors conducted this prosecution amounted to the Government's position in this case.

tainted by personal vindictiveness or another kind of bad faith. The Government says -- as did the lead prosecutor -- that the Superseding Indictment was the result of further investigation that led the prosecutors to find other persons who could testify to Defendant's criminal conduct. Rejecting the prosecutor's explanation, the District Judge, among other things, found: "The patients that were included in the Superseding Indictment were known to the Government long before the motion to suppress was litigated, yet no Superseding Indictment was sought at an earlier time." Shaygan, 661 F. Supp. 2d at 1298.

The Government argues that this statement is clearly erroneous. The Government says that it is not true that all of the specifically named people -- specific patients of Defendant -- added in the Superseding Indictment were known to the Government earlier.

I do not read the District Court's sentence the same way as the Government does, and I am confident that the sentence need not be read the way the Government reads it. I think the District Judge was saying (1) that the Government's prosecutor was well aware, before the motion to suppress was even filed, that Defendant had other patients (a class of other potential witnesses that were out in the world);[11] and (2) that the Government's prosecutor took no action

---

[11] I submit that it is significant that the Government obtained Defendant's day planner when Defendant was arrested: more than three months before the motion to suppress was even

58

to find any of these other potential witnesses until the prosecutor became distressed and angry with defense counsel because of the motion. The Government concedes it was on account of the motion to suppress and its allegations -- that certain DEA agents had lied -- that the prosecutor threatened defense counsel with a "seismic shift" in how the Government was going to proceed in the prosecution.

So, it may be true that the prosecutor, long before the Superseding Indictment, did not know specifically the identity of witness X, Y, or Z. I do not think that the District Judge was necessarily saying that the prosecutor did know those details. But the prosecutor did know that there were very likely people like X, Y, or Z who were in existence and who likely could be found; and until the prosecutor became angry and hostile towards defense counsel, these witnesses were not actively looked for. I think the District Judge was making the latter observation about what the prosecutor knew when the District Judge says, "[t]he patients that were included in the Superseding Indictment were known to the Government long before . . . ." Id. Therefore, what the District Judge said -- even in this one isolated sentence contained in a long and detailed order -- is not truly clearly erroneous.

At times, I get the sense that the concern with applying the Hyde

---

filed. This day planner contained the names of several of Defendant's patients -- and led the Government to still other patients -- who were later named in the Superseding Indictment.

Amendment to this case is a worry that the resulting precedent will, in some way, open the floodgates to the Executive Branch's being hit with attorney's fees whenever the Executive Branch loses a criminal prosecution. I think this flood is improbable. I submit the first thing to realize is that the Executive Branch hardly ever loses a criminal prosecution.[12] Therefore, the idea of a flood is, to my way of thinking, pretty theoretical.

Moreover, the Hyde Amendment is not a "loser pays" law. The burden is on the prevailing defendant to prove that a prosecution was "vexatious, frivolous, or in bad faith." Placing the burden on the acquitted defendant made recovery of expenses and fees in criminal cases inherently more difficult than under the EAJA, where the burden is on the Government. Furthermore, the fact of an acquittal, in and of itself, is no evidence that the Government's position was vexatious or frivolous or in bad faith. In addition and apart from everything else, the statute itself allows a District Judge to withhold expenses and attorney fees whenever circumstances would make such an award "unjust."[13] No good reason exists to

[12] From 2000 to 2009, the percentage of defendants who were ultimately convicted in a given year ranged from 88.57% to 90.70%. Dept. of Justice, Bureau of Justice Statistics, (Defendants in criminal cases closed: Trends, FY 2000-2009, Verdict or outcome of trial: All values, Percents), http://bjs.ojp.usdoj.gov/fjsrc.

[13] About sovereign immunity, if too much money starts being paid by the Department of Justice pursuant to court orders under the Hyde Amendment, Congress can amend the statute (for example, cap the fees or rewrite the qualifying standards) or repeal the statute altogether, withdrawing the waiver of sovereign immunity. In the meantime, all I know to do is to read the

believe that United States District Judges are going to make awards under the Hyde Amendment lightly.[14]  I also think the facts of prosecutorial misconduct in this case -- as found by the District Judge -- are exceptionally troubling: I do not believe we will often see cases involving fact-findings for this sort of extensively manifested prosecutorial ill will toward the defendant and defense lawyers.[15]

I disagree with the idea that, if the Department of Justice and its lawyers are under the supervision, in some way, of federal judges -- when the Department of Justice and its lawyers are actively engaged in litigating a case before a United States Court --  a violation of the separation of powers is looming.  I am inclined to think just the opposite.  For me, it is the instances of the treating of the Department

---

text of the statute, giving the words what I understand to be their ordinary meaning.

[14] I do not accept that reading the statutory language "in bad faith" as an issue of subjective intent makes it too easy for fees to be awarded or, in some way, makes "bad faith" an easier standard to prove than an objective standard like "frivolous." See, e.g., Jackson v. Walker, 585 F.2d 139, 143 (5th Cir. 1978) ("[I]t is difficult to prove in court the actual state of mind of a prosecutor during his exercise of discretion.") (habeas case, involving claim of unconstitutional vindictiveness).  I think District Judges are more likely to attribute questionable prosecutorial positions to good faith but -- unreasonably or reasonably -- mistaken decisions.

[15] Enormously troubling is the fact, found by the District Court, that the Government pressed its investigation of the defense team "for the bad faith purpose of seeking to disqualify the defense lawyers for conflict-of-interest immediately prior to trial." Shaygan, 661 F. Supp. 2d at 1310.  The District Court wrote that, if this objective had been realized, it would have been "catastrophic" for Defendant. Id. at 1311.  In addition to the effort, trouble, and expense inherent in replacing Defendant's chosen lawyers who already knew his case, delay of the trial would have been against Defendant's other interests: he was not free while awaiting trial, but was instead confined to his home under strict condition of house arrest.  I do not expect the courts will often see conduct that would suggest this level of prosecutorial malice toward a defendant and his lawyers.

of Justice and its prosecutors differently from -- and better than -- other litigants that threaten the separation of powers between the Judicial Branch and the Executive Branch. But to decide the present case, I think that we need not dispute about the concept of separation of powers at a high level of abstraction.[16]

In this case, the District Judge did not attempt to exercise some inherent power of the judiciary to assess attorney's fees and expenses against the Executive Branch (although the District Judge did invoke this inherent power to reprimand publicly individual prosecutors). In assessing fees and expenses, the District Judge acted pursuant to a statute that was enacted by Congress and signed into law by the President. This fact in itself might not answer any and all possible questions about separations of powers for every case, but I think it goes so far that we need not worry much about it to decide this case.

To end as I began, I believe this case is about statutory construction. Based on the text of the statute, I believe that the phrase "or in bad faith" was intended to reach prosecutions conducted in a manner that was motivated by -- and that demonstrated -- personal vindictiveness, personal ambition, politics, and so on.

A high-minded prosecutor, with a clean heart, can still commence a "frivolous" prosecution or conduct a prosecution in a "vexatious" way, if the

---

[16] By the way, the phrase "the separation of powers" never appears in the Department of Justice's brief, and the Department has never argued anything about that kind of issue.

prosecutor's acts are objectively unreasonable: in this way, the Hyde Amendment can be triggered. More important for this case, even **_IF_** a prosecutor's acts are objectively reasonable, the Government's position can be "in bad faith" if the prosecutor acts with ill will: in this way as well, the Hyde Amendment can be triggered.

I believe the record in this case allowed the District Judge to find, as a matter of fact, that the prosecutor's personal vindictiveness prominently marked the Government's position as the prosecution against Defendant went forward. Therefore, I would affirm the Hyde Amendment award.

I agree that the individual sanctions against Mr. Cronin and Ms. Hoffman were entered without proper notice and process. I also agree that insufficient reason exists to remove the District Judge from this case on remand.